**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| D.J. SIMMONS, INC., | § | |
| | § | 02 APR 22 AM 10: 18 |
| Plaintiff, | § | |
| | § | |
| v. | § | No. CIV 99-1105 JP/LFG |
| | § | |
| F. BRIAN BROADDUS and B/R | § | |
| ENERGY PARTNERS, INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW AND
## TRIAL BRIEF IN SUPPORT OF CONCLUSIONS OF LAW

Comes now **D.J. SIMMONS, INC.** ("Simmons"), Plaintiff herein, and files this its Plaintiff's Proposed Findings of Fact and Conclusions of Law, and Trial Brief in Support of Conclusions of Law and moves this Court to adopt the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1.      Plaintiff D.J. Simmons, Inc. ("Simmons") is a corporation incorporated in the State of Delaware with its principal place of business in Farmington, New Mexico.

2.      Simmons contracted with B/R Energy Partners, Inc., which contracts form the basis of Simmons' claims.

3.      B/R Energy Partners, Inc. was a corporation incorporated in Texas, dissolved in November of 1998, and never obtained a certificate to do business in New Mexico.

4.      As a dissolved corporation, it was served with a copy of summons and this Complaint by serving its President, F. Brian Broaddus, at 4905 E. 84th Street, Tulsa, Oklahoma.



5. F. Brian Broaddus, a nonresident, has been served with a copy of summons and this Complaint at 4905 E. 84th Street, Tulsa, Oklahoma.

6. Broaddus was at all relevant times the President, sole director and shareholder of B/R Energy Partners, Inc.

7. Phoenix Energy Consulting Services, Inc. is a corporation incorporated and doing business in the State of Oklahoma.

8. This Court has removal jurisdiction over the lawsuit under 28 U.S.C. § 1441 because the Plaintiff and the Defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Venue is proper under 28 U.S.C. § 1391(a)(2) in that a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property at issue is situated, in the District of New Mexico.

10. This lawsuit arises from a dispute between Simmons and B/R Energy Partners, Inc. regarding the proper accounting and payment due Simmons under gas purchase and sales agreements for liquid gas products after the gas is processed at gas plants within San Juan County, New Mexico.

11. Commencing approximately December 1, 1995, Simmons sold its gas at the wellhead to B/R Energy Partners, Inc. until the expiration of the last contract on December 31, 1998.

12. P-1 is the complete Gas Purchase and Sales Agreement, dated December 1, 1995, between B/R Energy Partners, Inc., as Buyer, and Simmons, as Seller. F. Brian Broaddus signed P-1 as President of B/R Energy Partners, Inc. F. Brian Broaddus negotiated the terms of P-1 on

behalf of B/R Energy Partners, Inc. The 1995 Gas Contract (P-1) provides as follows with respect to the liquid credit:

"Seller will receive liquid credits."

13.    The gas produced from the wellheads of Simmons' wells in San Juan and Rio Arriba County, New Mexico was transported on El Paso Field Services' pipeline system.

14.    Simmons' gas on El Paso's System was processed at two plants.

15.    The first plant is known as the El Paso <u>Chaco</u> plant and the second plant being Conoco's <u>Blanco</u> plant.

16.    Plant operators, such as El Paso and Conoco, are compensated by the shippers of the gas for processing the gas and separating the liquid components. The terms of compensation are agreed upon in gas gathering and processing agreements between the parties, which are sometimes referred to as GPAS agreements.

17.    For many years, the Blanco plant was able to extract a much greater percentage of liquids than the Chaco plant, because the Blanco plant was of the "cryogenic expander" type, while the Chaco plant was not.

18.    In the latter part of 1996, El Paso updated its Chaco plant to the "cryogenic expander" process.

19.    At that same time, in its GPAS agreements, El Paso began raising its fee for processing the gas and giving shippers the option of conveying a portion of their liquids to El Paso (known as a liquid cut or liquid retention) in lieu of paying a processing fee.

20.    B/R Energy Partners, Inc. did not have a GPAS agreement with the gas processors at the Chaco and Blanco plants; instead it arranged to have its gas gathered and processed under its downstream gas purchaser's GPAS agreements with El Paso Field Services (those downstream gas purchasers being Cook Inlet, Equitable Energy and Amoco.)

21.     Separate and apart from the GPAS agreements upon which terms the gas was gathered and processed and the compensation for such services was agreed upon between the shipper (downstream gas purchaser) and the gas processor (El Paso Field Services), initial purchasers of gas in the San Juan Basin (including B/R Energy Partners, Inc.) negotiated the price terms of their wellhead gas purchase contracts with producer-sellers (including Simmons) upon various terms. In some gas purchase contracts, the full gas stream is sold and title passes at the wellheads, but the price provisions are based on index prices at the tailgate of the processing plants, with deductions taken from such index prices as agreed upon by the parties. In most cases, residue gas at the tailgate of the plant would be based on an index price, less certain deductions for gathering, dehydration, and processing the gas. Likewise, a liquid credit would be given for the liquid components, which would be generally based on an index price less transportation of the liquids to a fractionation plant, fractionation fees and marketing fees assessed, if any. All such terms are negotiable. In accounting to the producer-seller, the buyer accounts to the seller based on the terms of their agreement, regardless of the terms which the buyer agreed with the gas processor or the downstream purchasers of the residue gas and liquids. In fact, it is the margin between what the buyer agrees to pay the seller and what the buyer receives upon the resale of the gas and liquids less his costs, that generates the buyer's profit.

22.     As a result of the new "cryogenic" capabilities of the El Paso plant, B/R Energy Partners, Inc. presented to Simmons certain options for its gas purchase contract to begin on December 1, 1996.

23.     P-2 is a letter dated November 6, 1996 from B/R Energy Partners, Inc. to Simmons. P-2 was signed by F. Brian Broaddus in his capacity as President of B/R Energy Partners, Inc. P-2 is the "gas purchase proposal" which proposed to Simmons the options for

liquid processing charges. "Proposal 1" provided for a liquid retention in lieu of a fee as a deduction for processing the gas; "Proposal 2" charged a fee per MMBtu for processing the gas.

24.     Simmons accepted Proposal No. 2 set forth in the November 6, 1996 letter agreement, attached as P-2.

25.     P-3 is a Gas Purchase and Sales Agreement between B/R Energy Partners, Inc., as Buyer, and Simmons as Seller, dated December 1, 1996. P-3 was signed on behalf of B/R Energy Partners, Inc. by F. Brian Broaddus, as President. It commenced December 1, 1996. The 1996 Gas Contract (P-2 and 3) provides as follows with regard to the liquid credit:

> "Liquid Credits: Natural gas liquids pricing will be based upon EPFS OPIS non-TET Mt. Belvieu averages per component, less transportation, fractionation and any other fees levied by the transporter. Recoveries are based upon current mole percent averages provided by EPFS and may be subject to change due to plant operating condition. (P-2).
>
> . . ."Buyer shall pay Seller liquid credits attributable to 100% of such production." (P-3).

26.     P-4 is a letter dated November 18, 1997 from B/R Energy Partners, Inc. with a fax cover sheet dated November 18. P-4 was signed by Cliff Barker, Director of Marketing of B/R Energy Partners, Inc. Cliff Barker was authorized by F. Brian Broaddus in his capacity as President of B/R Energy Partners, Inc. to make the proposal set for in P-4 to Simmons. P-5 is a Gas Purchase and Sale Agreement between B/R Energy Partners, Inc., as Buyer and Simmons as Seller, date January 1, 1998. P-5 was signed by F. Brian Broaddus, as President for B/R Energy Partners, Inc. P-6 is a letter dated December 5, 1997, from John A. Byrom, Operations Manager of Simmons, addressed to Cliff Barker of B/R Energy Partners, Inc., which B/R Energy Partners, Inc. received and accepted at about such date. The 1998 Gas Contract (P-4, 5, and 6) provided as follows with respect to liquid credits.

"NGL Pricing: Prices paid for component gallons of NGL products shall be based on Mt. Belvieu OPIS averages pricing less fractionation, gathering, transportation and marketing fees existing at the time of the sale of such products." (P-4).

"Buyer shall pay Seller liquid credits for NGL gallons attributable to Buyer's GPAS agreement based on OPIS Mt. Belvieu averages, less any processing, transportation, fractionation, and marketing fees assessed. (P-5)

27.    P-7 is a letter from John A. Byrom, Vice President and Operations Manager of Simmons, dated November 16, 1998 addressed to Brian Broaddus of B/R Energy Partners, Inc., which B/R Energy Partners, Inc. received at or about the date of said letter.

28.    P-8 is a letter dated April 13, 1999, from Stan Harvey of Winstead Sechrest & Minick P.C. representing Simmons and addressed to B/R Energy Partners, Inc., Attention: Brian Broaddus, which B/R Energy Partners, Inc. received on May 4, 1999 through legal counsel in Tulsa, Oklahoma.  In responding to the April 13, 1999 letter (P-8), B/R Energy Partners, Inc. stated that the data needed to conduct an accounting was unavailable.

29.    F. Brian Broaddus was the President of B/R Energy Partners, Inc. from December 1995 to the date of dissolution.

30.    F. Brian Broaddus was the sole director of B/R Energy Partners, Inc. from December 1995 to the date of dissolution.

31.    F. Brian Broaddus was the sole shareholder of B/R Energy Partners, Inc. from December 1995 until B/R Energy Partners, Inc.'s dissolution.

32.    B/R Energy Partners, Inc. was a corporation incorporated under the laws of the State of Texas.

33.    B/R Energy Partners, Inc. filed Articles of Dissolution with the Secretary of State of Texas.

34.     B/R Energy Partners, Inc. obtained from the Secretary of State of Texas a Certificate of Dissolution on November 23, 1998.

35.     F. Brian Broaddus was the member of the Board of Directors of B/R Energy Partners, Inc. when it was dissolved by the issuance of a Certificate of Dissolution by the Secretary of State of Texas.

36.     B/R Energy Partners, Inc. transacted business within the State of New Mexico during that period of time from December 1995 to November 1998.

37.     B/R Energy Partners, Inc. voluntarily dissolved on November 23, 1998.

38.     B/R Energy Partners, Inc. did not procure a Certificate of Authority to transact business in New Mexico from the Secretary of State of New Mexico.

39.     B/R Energy Partners, Inc. did not make application for a Certificate of Authority to transact business in New Mexico from the Secretary of State of New Mexico.

40.     The terms of the liquid credit in B/R Energy Partners, Inc. agreement with Simmons with respect to sales commencing December 1, 1995 is based on trade usage generally recognized in the gas marketing industry. The liquid credit is calculated by the gallons of liquid components (NGL) extracted and recovered at the plant attributable to the seller's interest for each component multiplied by its market price, or index price (Mont Belvieu OPIS non TET averages prices for each month for each component), adding the amounts of all the liquid components for a gross payment, and then taking deductions for transportation of the liquids from the processing plants, costs of fractionation, and any marketing fees assessed.

41.     F. Brian Broaddus made the promises of liquid credits to Simmons in paragraphs 12, 25 and 26 in his capacity as President of B/R Energy Partners, Inc.

42.     Broaddus has no support in documents and communications from third parties processing the gas that there was a 35 to 40 percent liquid shrinkage with respect to Simmons' natural gas processed at the El Paso Chaco plant.

43.     With respect to sales under P-1, B/R Energy Partners, Inc. purchased Simmons' natural gas at the Simmons' wellheads as referred to on the Exhibit A to the Gas Purchase and Sales Agreement.

44.     With respect to sales under the contract referred to in P-2 and P-3, B/R Energy Partners, Inc. purchased Simmons' natural gas at Simmons' wellheads, as referred to on the Exhibit A attached to the Gas Purchase and Sales Agreement, Exhibit P-3.

45.     With respect to the sale under the contract referred to in P-4, P-5 and P-6, B/R Energy Partners, Inc. purchased Simmons' natural gas at Simmons' wellheads as referred to on Exhibit A attached to the Gas Purchase and Sales Agreement (P-5).

46.     The terms of the 1995 Gas Contact, as set forth in P-1 hereto, the 1996 Gas Contract (P-2 and P-3) and the 1998 Gas Contract (P-4, P-5, and P-6) were not modified or amended.

47.     The parties' intentions as to the meaning and calculation of "liquid credits" as set forth in the 1995 Gas Contract (P-1) are as follows:

          a.     The determination of the price for the liquids extracted from the gas was to be based upon a market value calculation, *i.e.*, the Mont Belvieu OPIS non-TET monthly averages for each component.

          b.     The quantity of the liquids in determining a liquid credit was to be based upon the actual gallons of each liquid component recovered at the tailgate of the processing plant.

c.  The proper calculation for determining the "liquid credits" of the 1995 Gas Contract would be the actual gallons of each liquid component extracted and recovered from the gas processed at the plant each month multiplied by the market value of each liquid component less the costs for transportation and fractionation fee for each month during the contract year.

48.  The 1996 Gas Contract (P-2, P-3) was not changed orally by the parties, so that the quantity of gas at the tailgate of the processing plant and the gallons of liquid components extracted and recovered from said gas would be calculated based upon a non-cryogenic methodology ("Old Chaco"); rather recoveries were to be based upon current mole percent averages provided by El Paso Field Services under the plant operating conditions, *i.e.*, using cryogenic processing.

49.  During the time period of the 1995 Gas Contract (P-1), a liquid retention was taken by the gas processors in lieu of the gas processors charging B/R Energy a processing fee, for that part of Simmons' share of liquids sold to B/R Energy which was processed at the Conoco Blanco plant and commencing September, 1996, a liquid retention was also taken by the gas processors for that part of Simmons' share of liquids sold by B/R Energy which was processed at the El Paso Chaco plant.

50.  In accounting to Simmons under the 1995 Gas Contract (P-1), B/R Energy Partners, Inc. did not account to or pay Simmons for the liquid credit based on the market value of the gallons of each liquid component extracted and recovered from the processing plant less the costs of fractionation and transportation.

51.     In accounting to Simmons under the 1995 Gas Contract (P-1), B/R Energy Partners, Inc. charged Simmons a processing fee for the gas processor's services in processing Simmons' gas, but until September, 1996 B/R Energy Partners, Inc. also paid Simmons the liquid credit until September, 1996 based upon only the net gallons of liquids at the Blanco processing plant after deducting from the actual gallons recovered an amount equal to the gallons which the gas processor had taken in a liquid retention, and also based upon the actual gallons of liquids recovered at the El Paso Chaco plant, but at all times paid Simmons the liquid credit, and then commercially accounting to Simmons for the liquid credit from September, 1996 to November, 1996 based on a lesser amount which included only the net gallons it received at the El Paso Chaco plant and the Conoco Blanco plant as well as other deductions for Old Chaco methodology.

52.     During the term of the 1996 Gas Contract (P-2 and P-3), a liquid retention was taken by the gas processors at both the El Paso Chaco plant and the Conoco Blanco plant whereby approximately 39% of the liquids from Simmons' share of production sold to B/R Energy was taken and conveyed to the gas processors, in lieu of the gas processors charging the shipper and hence B/R Energy a processing fee.

53.     In accounting to Simmons under the 1996 Gas Contract (P-2 and P-3), B/R Energy Partners, Inc. deducted and charged Simmons a processing fee on all MMBtus of the gas stream at the inlet of the processing plants from the amount it paid Simmons for the residue gas and liquid credits, but also failed to account or pay Simmons for the liquid credit based on the market value of the gallons of each liquid component extracted and recovered from the processing plants less the costs of fractionation and transportation. Instead, it paid the liquid credit based on a lesser amount including only accounting for the net gallons for each liquid

component it received, after it deducted from the gallons actually recovered at the processing plants an amount equal to the gallons taken in the liquid retentions charged by the gas processors.

54.     During the term of the 1998 Gas Contract (P-4, P-5 and P-6) a liquid retention was taken by the gas processors at both the El Paso Chaco plant and the Conoco Blanco plant whereby 39% of the liquids from Simmons' share of production sold to B/R Energy was taken and conveyed to the gas processors in lieu of charging the shipper and hence B/R Energy a processing fee.

55.     In accounting to Simmons under the 1998 Gas Contract (P-4, P-5 and P-6), B/R Energy Partners, Inc. deducted and charged a processing fee on all MMBtus of the gas stream at the inlet of the processing plants from the amount it paid Simmons for the residue gas and liquid credits, but also failed to account to or pay Simmons for the liquid credit based on the market value of each component extracted and recovered from the liquid processing plant less the cost of fractionation and transportation. Instead, it paid the liquid credit based on only the net gallons for each liquid component recovered after it deducted from the gallons actually recovered at the processing plants an amount equal to the gallons taken in the liquid retention charged by the gas processors.

56.     In accounting to Simmons under the 1995 Gas Contract (P-1), the 1996 Gas Contract (P-2 and P-3) and the 1998 Gas Contract (P-4, P-5 and P-6), B/R Energy did not pay or account to Simmons the price for the liquid credit based on Mont Belvieu OPIS non-TET monthly averages per liquid component less the contractual deductions permitted by the contracts.

57.     B/R Energy Partners, Inc. breached the terms of the 1995 Gas Contract (P-1) by not properly accounting to Simmons for the liquid credits provided for in said contract pursuant to the contract's terms.

58.     B/R Energy Partners, Inc. breached the terms of the 1996 Gas Contract (P-2 and P-3) by not properly accounting to Simmons for the liquid credits provided for in said contract pursuant to the contract's terms.

59.     B/R Energy Partners, Inc. breached the terms of the 1998 Gas Contract (P-4, P-5 and P-6) by not properly accounting to Simmons for the liquid credits provided for in said contract pursuant to the contract's terms.

60.     B/R Energy Partners, Inc.'s breach of the 1995 Gas Contract (P-1) was a proximate cause of Simmons' injury and damages.

61.     B/R Energy Partners, Inc.'s breach of the 1996 Gas Contract (P-2 and P-3) was a proximate cause of Simmons' injury and damages.

62.     B/R Energy Partners, Inc.'s breach of the 1998 Gas Contract (P-4, P-5 and P-6) was a proximate cause of Simmons' injury and damages.

63.     B/R Energy Partners, Inc., as the purchaser under the 1995 Gas Contract, a gas contract in which the full wellstream including liquid components, was sold at the wellhead to B/R Energy Partners, Inc., was not entitled to deduct from the liquid credit a "marketing fee," for B/R Energy Partners, Inc.'s marketing its own liquid components.

64.     B/R Energy Partners, Inc., as the purchaser under the 1996 Gas Contract, a gas contract in which the full wellstream, including liquid components, was sold at the wellhead to B/R Energy Partners, Inc., was not entitled to deduct from the liquid credit a "marketing fee," for B/R Energy Partners, Inc.'s marketing its own liquid components to third parties.

65.     B/R Energy Partners, Inc., as the purchaser under the 1998 Gas Contract, a gas contract in which the full wellstream, including liquid components, was sold at the wellhead to B/R Energy Partners, Inc., was not entitled to deduct from the liquid credit a "marketing fee," for B/R Energy Partners, Inc.'s marketing its liquid components to third parties.

66.     Under the 1998 Gas Contract, the term "marketing fees assessed" was in reference to marketing fees assessed by third party liquids marketers, and was not for the gas purchaser to charge Simmons a marketing fee for B/R Energy selling its own liquids to others.

67.     Based upon the terms of the 1995 Gas Contract, $1,791,351.00 was the sum of money which Simmons was entitled to recover from B/R Energy Partners, Inc..

68.     Based upon the terms of the 1996 Gas Contract, $3,209,058.00 was the sum of money which Simmons was entitled to recover from B/R Energy Partners, Inc.

69.     Based upon the terms of the 1998 Gas Contract, $2,124,161.00 was the sum of money which Simmons was entitled to recover from B/R Energy Partners, Inc..

70.     $1,472,949.00 is the amount of money which B/R Energy Partners, Inc. paid to Simmons under the 1995 Gas Contract.

71.     $2,492,253.00 is the amount of money which B/R Energy Partners, Inc. paid to Simmons under the 1996 Gas Contract.

72.     $1,635,382.00 is the amount of money which B/R Energy Partners, Inc. paid to Simmons under the 1998 Gas Contract.

73.     $29,890.00 is the amount of interest on royalties due on federal leases and on production taxes by reason of B/R Energy Partners, Inc.'s failure to pay the proper liquid credit as consequential damages under the 1995 Gas Contract.

74. $56,182.00 is the amount of interest on royalties due on federal leases and on production taxes by reason of B/R Energy Partners, Inc.'s failure to pay the proper liquid credit as consequential damages under the 1996 Gas Contract.

75. $29,566.00 is the amount of interest on royalties due on federal leases and on production taxes by reason of B/R Energy Partners, Inc.'s failure to pay the proper liquid credit as consequential damages under the 1998 Gas Contract.

76. B/R Energy Partners, Inc. breached the duty of good faith and fair dealing implied in the 1995 Gas Contract, by charging Simmons a processing fee under the agreement as compensation for the processing of the gas, when no processing fee was being charged by the gas processor and in not disclosing in the liquid credit that the gallons of liquid components B/R Energy reported to Simmons were less than the actual gallons recovered in that B/R Energy was reducing those gallons by an amount not less than the gallons taken by the gas processors in a liquid retention and the reduced gallons based upon B/R Energy's non-cryogenic methodology.

77. B/R Energy Partners, Inc. breached the duty of good faith and fair dealing implied in the 1996 Gas Contract, by charging Simmons a processing fee under the agreement as compensation for the processing of the gas, when no processing fee was being charged by the gas processor and in not disclosing in the liquid credit that the gallons of liquid components B/R Energy reported to Simmons were less than the actual gallons recovered in that B/R Energy was reducing those gallons by an amount not less than the gallons taken by the gas processors in a liquid retention and the reduced gallons based upon B/R Energy's non-cryogenic methodology.

78. B/R Energy Partners, Inc. breached the duty of good faith and fair dealing implied in the 1998 Gas Contract, by charging Simmons a processing fee under the agreement as compensation for the processing of the gas, when no processing fee was being charged by the

gas processor and in not disclosing in the liquid credit that the gallons of liquid components B/R Energy reported to Simmons were less than the actual gallons recovered in that B/R Energy was reducing those gallons by an amount equal to the gallons taken by the gas processors in a liquid retention.

79.    B/R Energy Partners, Inc.'s actions in breach a duty of good faith and fair dealing under the 1995 Gas Contract were done with the intent to injure Simmons.

80.    B/R Energy Partners, Inc.'s actions in breach of its duty of good faith and fair dealing under the 1996 Gas Contract were done with the intent to injure Simmons.

81.    B/R Energy Partners, Inc.'s actions in breach of its duty of good faith and fair dealing under the 1998 Gas Contract were done with the intent to injure Simmons.

82.    B/R Energy Partners, Inc.'s actions in breach of its duty of good faith and fair dealing were accomplished with reckless disregard of the rights of Simmons under its 1995 Gas Contract.

83.    B/R Energy Partners, Inc.'s actions in breach of its duty of good faith and fair dealing were accomplished with reckless disregard of the rights of Simmons under its 1996 Gas Contract.

84.    B/R Energy Partners, Inc.'s actions in breach of its duty of good faith and fair dealing were accomplished with reckless disregard of the rights of Simmons under its 1998 Gas Contract.

85.    $348,293.00 is the amount of damages, both general and special, Simmons suffered as a proximate cause of B/R Energy Partners, Inc.'s breach of good faith and fair dealing under the 1995 Gas Contract.

86. $772,988.00 is the amount of damages, both general and special, Simmons suffered as a proximate cause of B/R Energy Partners, Inc.'s breach of good faith and fair dealing under the 1996 Gas Contract.

87. $518,345.00 is the amount of damages, both general and special, Simmons suffered as a proximate cause of B/R Energy Partners, Inc.'s breach of good faith and fair dealing under the 1998 Gas Contract.

88. $ _____ is the amount of punitive damages to which Simmons is entitled by reason of such intentional breaches of good faith and fair dealing.

89. Under the 1995 Gas Contract, B/R Energy Partners, Inc., as a fiduciary to Simmons in holding funds due Simmons in connection with the liquid credits, had a duty to properly account for all of Simmons' funds which B/R Energy Partners, Inc. held, to protect the contractual rights of Simmons and to distribute funds honestly and completely.

90. Under the 1996 Gas Contract, B/R Energy Partners, Inc., as a fiduciary to Simmons in holding funds due Simmons in connection with the liquid credits, had a duty to properly account for all of Simmons' funds which B/R Energy Partners, Inc. held, to protect the contractual rights of Simmons and to distribute funds honestly and completely.

91. Under the 1998 Gas Contract, B/R Energy Partners, Inc., as a fiduciary to Simmons in holding funds due Simmons in connection with the liquid credits, had a duty to properly account for all of Simmons' funds which B/R Energy Partners, Inc. held, to protect the contractual rights of Simmons and to distribute funds honestly and completely.

92. Under the 1995 Gas Contract, B/R Energy Partners, Inc. breached its fiduciary duties to Simmons by failing to properly account to Simmons for all its funds which B/R Energy Partners, Inc. held, and failing to distribute funds honestly and completely.

93. Under the 1996 Gas Contract, B/R Energy Partners, Inc. breached its fiduciary duties to Simmons by failing to properly account to Simmons for all its funds which B/R Energy Partners, Inc. held, and failing to distribute funds honestly and completely.

94. Under the 1998 Gas Contract, B/R Energy Partners, Inc. breached its fiduciary duties to Simmons by failing to properly account to Simmons for all its funds which B/R Energy Partners, Inc. held, and failing to distribute funds honestly and completely.

95. $348,293.00 is the amount of damages, both general and special, which Simmons suffered as a proximate cause of B/R Energy Partners, Inc.'s breach of its fiduciary duty under the 1995 Gas Contract.

96. $772,988.00 is the amount of damages, both general and special, which Simmons suffered as a proximate cause of B/R Energy Partners, Inc.'s breach of its fiduciary duty under the 1996 Gas Contract.

97. $518,345.00 is the amount of damages, both general and special, which Simmons suffered as a proximate cause of B/R Energy Partners, Inc.'s breach of its fiduciary duty under the 1998 Gas Contract.

98. B/R Energy Partners, Inc. acted in reckless disregard of the rights of Simmons in failing to perform as a prudent fiduciary under the circumstances in accounting for the 1995 Gas Contract.

99. B/R Energy Partners, Inc. acted in reckless disregard of the rights of Simmons in failing to perform as a prudent fiduciary under the circumstances in accounting for the 1996 Gas Contract.

100. B/R Energy Partners, Inc. acted in reckless disregard of the rights of Simmons in failing to perform as a prudent fiduciary under the circumstances in accounting for the 1998 Gas Contract.

101. $ _____ is the amount of punitive damages which Simmons is entitled to recover.

102. B/R Energy Partners, Inc. made a promise to account to Simmons for a liquid credit on the terms set forth in the 1995 Gas Contract to induce Simmons into entering into said contract.

103. B/R Energy Partners, Inc. made a promise to account to Simmons for a liquid credit on the terms set forth in the 1996 Gas Contract to induce Simmons into entering into said contract.

104. B/R Energy Partners, Inc. made a promise to account to Simmons for a liquid credit on the terms set forth in the 1998 Gas Contract to induce Simmons into entering into said contract.

105. B/R Energy Partners, Inc. had a present intention not to perform such promise at the time of making the promises of a liquid credit for the 1995 Gas Contract.

106. B/R Energy Partners, Inc. had a present intention not to perform such promise at the time of making the promises of a liquid credit for the 1996 Gas Contract.

107. B/R Energy Partners, Inc. had a present intention not to perform such promise at the time of making the promises of a liquid credit for the 1998 Gas Contract.

108. The promise to account to Simmons for a liquid credit as provided in the 1995 Gas Contract (P-1), was made with the intention of inducing Simmons to execute the 1995 Gas Contract (P-1).

109. The promise to account to Simmons for a liquid credit as provided in the 1996 Gas Contract (P-2, P-3), was made with the intention of inducing Simmons to execute the 1996 Gas Contract (P-2, P-3).

110. The promise to account to Simmons for a liquid credit as provided in the 1998 Gas Contract (P-4, P-5, P-6), was made with the intention of inducing Simmons to execute the 1998 Gas Contract.

111. The promise to account for a liquid credit as set forth in the 1995 Gas Contract was material to the terms of the contract.

112. The promise to account for a liquid credit as set forth in the 1996 Gas Contract was material to the terms of the contract.

113. The promise to account for a liquid credit as set forth in the 1998 Gas Contract was material to the terms of the contract.

114. Simmons relied on the promise for an accounting for a liquid credit as set forth in the 1995 Gas Contract in agreeing to the 1995 Gas Contract.

115. Simmons relied on the promise for an accounting for a liquid credit as set forth in the 1996 Gas Contract in agreeing to the 1996 Gas Contract.

116. Simmons relied on the promise for an accounting for a liquid credit as set forth in the 1998 Gas Contract in agreeing to the 1998 Gas Contract.

117. B/R Energy Partners, Inc.'s promise with the present intention not to so perform the 1995 Gas Contract was a proximate cause of Simmons' damages.

118. B/R Energy Partners, Inc.'s promise with the present intention not to so perform the 1996 Gas Contract was a proximate cause of Simmons' damages.

119. B/R Energy Partners, Inc.'s promise with the present intention not to so perform the 1998 Gas Contract was a proximate cause of Simmons' damages.

120. $348,293.00 is the damages, both general and special, which Simmons suffered under the 1995 Gas Contract, including the loss of Simmons' benefit of the bargain and special damages.

121. $772,988.00 is the damages, both general and special, which Simmons suffered under the 1996 Gas Contract, including the loss of Simmons' benefit of the bargain and special damages.

122. $518,345.00 is the damages, both general and special, which Simmons suffered under the 1998 Gas Contract, including the loss of Simmons' benefit of the bargain and special damages.

123. In accounting to Simmons under the 1995 Gas Contract, B/R Energy Partners, Inc. represented the quantities of liquid components extracted from Simmons' share of gas production each month in P-13 and P-14.

124. In accounting to Simmons under the 1996 Gas Contract, B/R Energy Partners, Inc. represented the quantities of liquid components extracted from Simmons' share of gas production each month in P-15.

125. In accounting to Simmons under the 1998 Gas Contract, B/R Energy Partners, Inc. represented the quantities of liquid components extracted from Simmons' share of gas production each month in P-16.

126. The representations as to the quantity of liquid components extracted and recovered in P-13 and P-14 were false for the 1995 Gas Contract.

127.    The representations as to the quantity of liquid components extracted and recovered in P-15 were false for the 1996 Gas Contract.

128.    The representations as to the quantity of liquid components extracted and recovered in P-16 were false for the 1998 Gas Contract.

129.    The false representations in accounting to Simmons under the 1995 Gas Contract were done with the intention of inducing Simmons into accepting B/R Energy Partners, Inc.'s payments based on the accountings each month.

130.    The false representations in accounting to Simmons under the 1996 Gas Contract were done with the intention of inducing Simmons into accepting B/R Energy Partners, Inc.'s payments based on the accountings each month.

131.    The false representations in accounting to Simmons under the 1998 Gas Contract were done with the intention of inducing Simmons into accepting B/R Energy Partners, Inc.'s payments based on the accountings each month.

132.    B/R Energy Partners, Inc. knew when it accounted to Simmons in P-13 and P-14 under the 1995 Gas Contract that the representations as to the quantity of liquids extracted from Simmons' share of gas production each month were false.

133.    B/R Energy Partners, Inc. knew when it accounted to Simmons in P-15 under the 1996 Gas Contract that the representations as to the quantity of liquids extracted from Simmons' share of gas production each month were false.

134.    B/R Energy Partners, Inc. knew when it accounted to Simmons in P-16 under the 1998 Gas Contract that the representations as to the quantity of liquids extracted from Simmons' share of gas production each month were false.

135. The representations as to the quantities of liquids extracted from Simmons' share of gas production each month during the 1995 Gas Contract time period, were material.

136. The representations as to the quantities of liquids extracted from Simmons' share of gas production each month during the 1996 Gas Contract time period, were material.

137. The representations as to the quantities of liquids extracted from Simmons' share of gas production each month during the 1998 Gas Contract time period, were material.

138. Simmons relied upon B/R Energy Partners, Inc.'s representations in P-13 and P-14 as to the quantities of liquids extracted from Simmons' share of production each month for the 1995 Gas Contract time period.

139. Simmons relied upon B/R Energy Partners, Inc.'s representations in P-15 as to the quantities of liquids extracted from Simmons' share of production each month for the 1996 Gas Contract time period.

140. Simmons relied upon B/R Energy Partners, Inc.'s representations in P-16 as to the quantities of liquids extracted from Simmons' share of production each month for the 1998 Gas Contract time period.

141. The false representations as to the quantities of liquids extracted from Simmons' share of production each month during the 1995 Gas Contract time period proximately cause injury and damages to Simmons.

142. The false representations as to the quantities of liquids extracted from Simmons' share of production each month during the 1996 Gas Contract time period proximately cause injury and damages to Simmons.

143. The false representations as to the quantities of liquids extracted from Simmons' share of production each month during the 1998 Gas Contract time period proximately cause injury and damages to Simmons.

144. $348,293.00 is the amount of damages, both general and special, which Simmons suffered by reason of said false representations for the 1995 contract year.

145. $772,988.00 is the amount of damages, both general and special, which Simmons suffered by reason of said false representations for the 1996 contract year.

146. $518,345.00 is the amount of damages, both general and special, which Simmons suffered by reason of said false representations for the 1998 contract year.

147. In accounting to Simmons in P-13 and P-14 under the 1995 Gas Contract each month, B/R Energy Partners, Inc. concealed the actual quantities of liquids extracted and recovered from Simmons' share of gas production each month.

148. In accounting to Simmons in P-15 under the 1996 Gas Contract each month, B/R Energy Partners, Inc. concealed the actual quantities of liquids extracted and recovered from Simmons' share of gas production each month.

149. In accounting to Simmons in P-16 under the 1998 Gas Contract each month, B/R Energy Partners, Inc. concealed the actual quantities of liquids extracted and recovered from Simmons' share of gas production each month.

150. B/R Energy Partners, Inc. knew that the quantities of liquids extracted and recovered from Simmons' share of gas production each month under the 1995 Gas Contract, as reported in its statements to Simmons in P-13 and P-14, were incorrect and such reported gallons were only for gallons after an amount not less than the gallons taken by a liquid retention had

been taken by the gas processor and the reduced gallons based upon B/R Energy's non-cryogenic methodology.

151.    B/R Energy Partners, Inc. knew that the quantities of liquids extracted and recovered from Simmons' share of gas production each month under the 1996 Gas Contract, as reported in its statements to Simmons in P-15, were incorrect and such reported gallons were only for gallons after an amount not less than the gallons taken by a liquid retention had been deducted and the reduced gallons based upon B/R Energy's non-cryogenic methodology.

152.    B/R Energy Partners, Inc. knew that the quantities of liquids extracted and recovered from Simmons' share of gas production each month under the 1998 Gas Contract, as reported in its statements to Simmons in P-16, were incorrect and such reported gallons were only for net gallons after a liquid retention had been taken by the gas processor.

153.    The concealment of the actual gallons for each liquid component extracted and recovered each month when B/R Energy Partners, Inc. accounted to Simmons under the 1995 Gas Contract, was done with the intention of inducing Simmons into accepting the payments that B/R Energy Partners, Inc. was making based on its accounting each month.

154.    The concealment of the actual gallons for each liquid component extracted and recovered each month when B/R Energy Partners, Inc. accounted to Simmons under the 1996 Gas Contract, was done with the intention of inducing Simmons into accepting the payments that B/R Energy Partners, Inc. was making based on its accounting each month.

155.    The concealment of the actual gallons for each liquid component extracted and recovered each month when B/R Energy Partners, Inc. accounted to Simmons under the 1998 Gas Contract, was done with the intention of inducing Simmons into accepting the payments that B/R Energy Partners, Inc. was making based on its accounting each month.

156.    The actual gallons of the liquids extracted and recovered from Simmons' share of the gas production each month was material under the 1995 Gas Contract.

157.    The actual gallons of the liquids extracted and recovered from Simmons' share of the gas production each month was material under the 1996 Gas Contract.

158.    The actual gallons of the liquids extracted and recovered from Simmons' share of the gas production each month was material under the 1998 Gas Contract.

159.    Simmons relied on P-13 and P-14 and the concealment of the actual gallons of liquid components extracted and recovered from Simmons' share of gas production each month under the 1995 Gas Contract in accepting B/R Energy Partners, Inc.'s payments.

160.    Simmons relied on P-15 and the concealment of the actual gallons of liquid components extracted and recovered from Simmons' share of gas production each month under the 1996 Gas Contract in accepting B/R Energy Partners, Inc.'s payments.

161.    Simmons relied on P-16 and the concealment of the actual gallons of liquid components extracted and recovered from Simmons' share of gas production each month under the 1998 Gas Contract in accepting B/R Energy Partners, Inc.'s payments.

162.    The concealment of the actual gallons of liquids extracted and recovered from Simmons' share of gas production each month was a proximate cause of Simmons' injury and damages under the 1995 Gas Contract.

163.    The concealment of the actual gallons of liquids extracted and recovered from Simmons' share of gas production each month was a proximate cause of Simmons' injury and damages under the 1996 Gas Contract.

164. The concealment of the actual gallons of liquids extracted and recovered from Simmons' share of gas production each month was a proximate cause of Simmons' injury and damages under the 1998 Gas Contract.

165. $348,293.00 is the amount of damages, general and special, which Simmons suffered by reason of such concealment for the 1995 Gas Contract, including the loss in the benefit of the bargain.

166. $772,988.00 is the amount of damages, general and special, which Simmons suffered by reason of such concealment for the 1996 Gas Contract, including the loss in the benefit of the bargain.

167. $518,345.00 is the amount of damages, general and special, which Simmons suffered by reason of such concealment for the 1998 Gas Contract, including the loss in the benefit of the bargain.

168. $ _____ is the amount of punitive or exemplary damages to which Simmons is entitled for fraud.

169. B/R Energy Partners, Inc. did not know that the liquids it reported as being extracted from Simmons' share of production in its statements to Simmons at any time during the terms of the 1995, 1996 and 1998 Gas Contracts were not the actual quantities of the liquid components attributable to Simmons' share of production, but a net quantity after the gas processor had deducted a liquid retention from the actual quantities for its compensation in processing the gas and extracting the liquid components.

170. Simmons and B/R Energy Partners, Inc. labored under a mutual mistake that the liquid components attributable to Simmons' share of production upon which the liquid credit

would be paid under the 1995 Gas Contract were the actual quantities of such liquid components without any liquid retention being taken by the gas processor.

171.    Simmons and B/R Energy Partners, Inc. labored under a mutual mistake that the liquid components attributable to Simmons' share of production upon which the liquid credit would be paid under the 1996 Gas Contract were the actual quantities of such liquid components without any liquid retention being taken by the gas processor.

172.    Simmons and B/R Energy Partners, Inc. labored under a mutual mistake that the liquid components attributable to Simmons' share of production upon which the liquid credit would be paid under the 1998 Gas Contract were the actual quantities of such liquid components without any liquid retention being taken by the gas processor.

173.    That liquid credits were to be calculated based upon the actual quantities of the liquid components extracted at the plants attributable to Simmons' share of production, and not a net quantity, was material and part of the basis of the bargain in the formation of the 1995 Gas Contract.

174.    That liquid credits were to be calculated based upon the actual quantities of the liquid components extracted at the plants attributable to Simmons' share of production and not a net quantity, was material and part of the basis of the bargain in the formation of the 1996 Gas Contract.

175.    That liquid credits were to be calculated based upon the actual quantities of the liquid components extracted at the plants attributable to Simmons' share of production and not a net quantity, was material and part of the basis of the bargain in the formation of the 1998 Gas Contract.

176.     Simmons was not negligent in not knowing that B/R Energy Partners, Inc. was accounting to it for a liquid credit based on the net quantities of the liquid components after the processor had taken a liquid retention.

177.     The mutual mistake in the 1995 Gas Contract proximately caused Simmons' damages by B/R Energy Partners, Inc.'s undercompensating Simmons for the liquid credit and the loss of the benefit of Simmons' bargain.

178.     The mutual mistake in the 1996 Gas Contract proximately caused Simmons' damages by B/R Energy Partners, Inc.'s undercompensating Simmons for the liquid credit and the loss of the benefit of Simmons' bargain.

179.     The mutual mistake in the 1998 Gas Contract proximately caused Simmons' damages by B/R Energy Partners, Inc.'s undercompensating Simmons for the liquid credit and the loss of the benefit of Simmons' bargain.

180.     $1,523,987.00 was the amount Simmons should have received under the gas contracts based on market value of the liquid components from Simmons' share of production which Simmons did not receive an accounting, less the amount which B/R Energy paid under the gas contract.

181.     B/R Energy Partners, Inc.'s failing to account to Simmons for the actual gallons of liquid components extracted and recovered from the gas processed was a conversion of the liquid components taken by the gas processor as a liquid retention.

182.     By taking Simmons' gas and failing to account to Simmons in the liquid credit for actual gallons of the liquid components extracted and recovered, but only for net gallons after B/R Energy's deducting an amount equal to the gallons taken by the liquid retention to pay its gas processor, B/R Energy exerted wrongful acts of dominion over the difference between the

actual and net gallons of such liquid components and their proceeds in denial of, and inconsistent with, Simmons' rights under the 1995 Gas Contract.

183. By taking Simmons' gas and failing to account to Simmons in the liquid credit for actual gallons of the liquid components extracted and recovered, but only for net gallons after B/R Energy's deducting an amount equal to the gallons taken by the liquid retention to pay its gas processor, B/R Energy exerted wrongful acts of dominion over the difference between the actual and net gallons of such liquid components and their proceeds in denial of, and inconsistent with, Simmons' rights under the 1996 Gas Contract.

184. By taking Simmons' gas and failing to account to Simmons in the liquid credit for actual gallons of the liquid components extracted and recovered, but only for net gallons after B/R Energy's deducting an amount equal to the gallons taken by the liquid retention to pay its gas processor, B/R Energy exerted wrongful acts of dominion over the difference between the actual and net gallons of such liquid components and their proceeds in denial of, and inconsistent with, Simmons' rights under the 1998 Gas Contract.

185. By B/R Energy Partners, Inc.'s taking delivery of all of Simmons' gas and failing to account for the actual gallons of the liquid components extracted and recovered from the gas in its liquid credit, but only for net gallons after B/R Energy's deducting an amount equal to the gallons taken by the liquid retention to pay its gas processor, it departed so far from the conditions under which Simmons agreed to deliver and B/R Energy Partners, Inc. agreed to receive the liquids in Simmons' gas stream in the 1995 Gas Contract, so as to constitute a conversion of the liquids not accounted for.

186. By B/R Energy Partners, Inc.'s taking delivery of all of Simmons' gas and failing to account for the actual gallons of the liquid components extracted and recovered from the gas

in its liquid credit, but only for net gallons after B/R Energy's deducting an amount equal to the gallons taken by the liquid retention to pay its gas processor, it departed so far from the conditions under which Simmons agreed to deliver and B/R Energy Partners, Inc. agreed to receive the liquids in Simmons' gas stream in the 1996 Gas Contract, so as to constitute a conversion of the liquids not accounted for.

187. By B/R Energy Partners, Inc.'s taking delivery of all of Simmons' gas and failing to account for the actual gallons of the liquid components extracted and recovered from the gas in its liquid credit, but only for net gallons after B/R Energy's deducting an amount equal to the gallons taken by the liquid retention to pay its gas processor, it departed so far from the conditions under which Simmons agreed to deliver and B/R Energy Partners, Inc. agreed to receive the liquids in Simmons' gas stream in the 1998 Gas Contract, so as to constitute a conversion of the liquids not accounted for.

188. $224,318.00 is the market value of the gallons of the liquid components at the time of conversion which were not accounted for by B/R Energy Partners, Inc. in accounting for the liquid credit under the 1995 Gas Contract.

189. $654,344.00 is the market value of the gallons of liquid components at the time of conversion which were not accounted for by B/R Energy Partners, Inc. in accounting for the liquid credit under the 1996 Gas Contract.

190. $381,618.00 is the market value of the gallons of liquid components at the time of conversion which were not accounted for by B/R Energy Partners, Inc. in accounting for the liquid credit under the 1998 Gas Contract.

191. The conversion of the proceeds of the liquid components was attended with fraud under the 1995 Gas Contract and was malicious.

192. The conversion of the proceeds of the liquid components was attended with fraud under the 1996 Gas Contract and was malicious.

193. The conversion of the proceeds of the liquid components was attended with fraud under the 1998 Gas Contract and was malicious.

194. The liquid components extracted from Simmons' share of production of gas were of a changing or fluctuating value and the conversion was of a continuing nature during the terms of the 1996, 1996 and 1997 gas contracts and thereafter to the time of suit.

195. $2,162,589.00 is the market value of all the gallons of the liquid components converted based on the highest value between the date of conversion and the time of suit and without deduction for costs to increase the liquids' market value after having been taken at the wellheads.

196. $ _____ is the amount of damages to which Simmons is entitled to recover as punitive damages for such conversion.

197. B/R Energy Partners, Inc. is the alter ego of F. Brian Broaddus. F. Brian Broaddus is personally responsible for the wrongs of B/R Energy Partners, Inc. against Simmons.

198. Broaddus made the fraudulent representations referred to hereinabove with respect to the 1995 Gas Contract.

199. Broaddus made the fraudulent representations referred to hereinabove with respect to the 1996 Gas Contract.

200. Broaddus made the fraudulent representations referred to hereinabove with respect to the 1998 Gas Contract.

201. Broaddus made the fraudulent promises referred to under the 1995 Gas Contract as referred to hereinabove.

202. Broaddus made the fraudulent promises referred to under the 1996 Gas Contract as referred to hereinabove.

203. Broaddus made the fraudulent promises referred to under the 1998 Gas Contract as referred to hereinabove.

204. Broaddus participated in the fraud in making the above fraudulent representations and promises.

205. Broaddus participated in the concealment of material facts referred to hereinabove for the 1995 Gas Contract.

206. Broaddus participated in the concealment of material facts referred to hereinabove for the 1996 Gas Contract.

207. Broaddus participated in the concealment of material facts referred to hereinabove for the 1998 Gas Contract.

208. Broaddus aided and abetted B/R Energy Partners, Inc. in its fraudulent representations referred to hereinabove with respect to the 1995 Gas Contract.

209. Broaddus aided and abetted B/R Energy Partners, Inc. in its fraudulent representations referred to hereinabove with respect to the 1996 Gas Contract.

210. Broaddus aided and abetted B/R Energy Partners, Inc. in its fraudulent representations referred to hereinabove with respect to the 1998 Gas Contract.

211. Broaddus aided and abetted B/R Energy Partners, Inc. in connection with its fraudulent promises in connection with the 1995 Gas Contract.

212. Broaddus aided and abetted B/R Energy Partners, Inc. in connection with its fraudulent promises in connection with the 1996 Gas Contract.

213. Broaddus aided and abetted B/R Energy Partners, Inc. in connection with its fraudulent promises in connection with the 1995 Gas Contract.

214. Broaddus aided and abetted B/R Energy Partners, Inc. in its fraudulent concealment of material facts to Simmons as referred to hereinabove with respect to the 1995 Gas Contract.

215. Broaddus aided and abetted B/R Energy Partners, Inc. in its fraudulent concealment of material facts to Simmons as referred to hereinabove with respect to the 1996 Gas Contract.

216. Broaddus aided and abetted B/R Energy Partners, Inc. in its fraudulent concealment of material facts to Simmons as referred to hereinabove with respect to the 1998 Gas Contract.

217. Broaddus, as the shareholder of B/R Energy Partners, Inc., is liable to Simmons for B/R Energy Partners, Inc.'s contractual obligations to Simmons and any matters relating thereto arising from such obligations, on the basis of actual fraud *i.e.*, Broaddus' use of B/R Energy Partners, Inc. for the purposes of perpetuating the fraud referred to hereinafter upon Simmons, B/R Energy Partners, Inc. perpetuating a fraud on Simmons, which fraud was primarily for the direct personal benefit of Broaddus.

218. B/R Energy Partners, Inc. was the instrumentality of Broaddus and was dominated by Broaddus and B/R Energy Partners, Inc. was not operated in a legitimate fashion to serve the valid goals and purposes of the corporation, but functioned instead under the domination and control and for the purposes of Broaddus, and such domination and control was

not only of the finances, but also the policy and business practices with respect to the transactions at issue in this action.

219.    B/R Energy Partners, Inc. was undercapitalized from 1995 to its dissolution.

220.    Broaddus utilized B/R Energy Partners, Inc. for improper purposes to defraud Simmons, as noted above.

221.    Broaddus utilized B/R Energy Partners, Inc. for improper purposes as a sham to cause injustice to Simmons, in that B/R Energy Partners, Inc. was undercapitalized and funds were drawn for the purpose of diverting corporate funds to the detriment of Simmons, a creditor of B/R Energy Partners, Inc.

222.    Broaddus caused B/R Energy Partners, Inc. to transfer all of its assets to Broaddus or an entity controlled by Broaddus as a distribution of the assets of the corporation before accounting to Simmons for monies owed by reason of contractual and tortious wrongs.

223.    By Broaddus causing B/R Energy Partners, Inc. to divest itself of all of its assets at its dissolution, left Simmons, as an obligee of an executory contract or as a holder of claims in tort, remediless against B/R Energy Partners, Inc.

224.    Broaddus' use of B/R Energy Partners, Inc. as an instrumentality of his and his domination over B/R Energy Partners, Inc., for the above improper purposes, was a proximate cause of Simmons' injuries.

225.    Broaddus' domination of B/R Energy Partners, Inc. and utilization of B/R Energy Partners, Inc. for improper purposes proximately caused Simmons' damages.

226.    Broaddus denuded B/R Energy Corporation of its assets at its dissolution.

227.    Broaddus used B/R Energy Partners, Inc. in a scheme to generate income through defrauding Simmons.  Broaddus' control over B/R Energy Partners, Inc. was exercised in a

manner so as to commit fraud upon Simmons as well as to convert liquids and the proceeds from Simmons and to leave Simmons remediless upon its discovery of such wrongs.

228.    B/R Energy Partners, Inc. was a closely held corporation having substantial obligations and Broaddus siphoned off the corporate revenues, selling off its assets and undertaking other actions to hinder the ongoing business and its ability to pay off debts.

229.    Broaddus set up a new business in the form of Phoenix Energy Consulting Services, Inc. as a continuation of the business of B/R Energy Partners, Inc. with the same shareholders, officers and directors.

230.    There was a knowing and cooperative effort between Broaddus and B/R Energy Partners, Inc. which resulted in unjust injury to Simmons.

231.    Broaddus, as a director and shareholder of B/R Energy Partners, Inc., made and received distributions of dividends in contravention of TEX. BUS. CORP. ACT ANN. art. 2.38 (Vernon Supp. 2002) considering the indebtedness owed to Simmons at the time of the distributions.

232.    Over $4,260,738.00 of such distributions to Broaddus exceeded the amount permitted by TEX. BUS. CORP. ACT ANN. art. 2.38 (Vernon Supp. 2002).

233.    B/R Energy Partners, Inc.'s transfer of all of its assets to Phoenix Energy Consulting Services, Inc. without consideration is a fraudulent transfer under N.M. STAT. ANN. § 56-10-14 (Miche 1978).

234.    A. The transfers made by B/R Energy Partners, Inc. are fraudulent as to Simmons in that B/R Energy Partners, Inc. made the transfers:

> (1)    with actual intent to hinder, delay or defraud Simmons, a creditor of the debtor;

(2) without receiving a reasonably equivalent value in exchange for the transfer, and B/R Energy Partners, Inc.

    (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

    (b) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

In determining actual intent, consideration was given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor has been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred to essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

235.    The transfers made by B/R Energy Partners, Inc. are fraudulent as to Simmons whose claim arose before the transfer was made, in that B/R Energy Partners, Inc. made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

236.    The transfers made by B/R Energy Partners, Inc. are fraudulent as to Simmons whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, B/R Energy was insolvent at that time and the insider had reasonable cause to belief that the debtor was insolvent.

237.    Phoenix is an instrumentality of Broaddus and under Broaddus' domination and control and was set up for the improper purpose of holding the assets of B/R Energy Partners, Inc. in order to leave creditors of B/R Energy Partners, Inc. remediless to collect their contingent and unliquidated demands and Phoenix has proximately caused Simmons' injuries.

238.    Phoenix is a successor corporation to B/R Energy Partners, Inc. and was formed to continue the business of B/R Energy Partners, Inc. with essentially the same shareholders and directors and all of the property of B/R Energy Partners, Inc. being transferred to Phoenix for no consideration.

239. $_____ is the amount of reasonable attorney's fees to which Simmons is entitled to recover for necessary work on those claims for which attorney's fees are recoverable under New Mexico law.

240. $1,003,306.00 is the amount of pre-judgment interest to which Simmons is entitled to recover on all claims except for the conversion claims where there has been an adjustment to the highest price of the liquid components from the dates of conversion to time of suit, in which case, $1,392,1425.00 is the amount as of January 31, 2002 of pre-judgment interest to which Simmons is entitled.

241. None of Simmons' claims are barred by limitations.

242. There was no course of performance between Simmons and B/R Energy Partners, Inc. which estops Simmons from claiming the damages it has suffered.

243. There was no course of dealing between Simmons and B/R Energy Partners, Inc. which estops Simmons from claiming damages against B/R Energy Partners, Inc..

244. There was no course of performance between Simmons and B/R Energy Partners, Inc. by which Simmons waived claims against B/R Energy Partners, Inc..

245. There was no course of dealing between Simmons and B/R Energy Partners, Inc. whereby Simmons waived causes of action and claims against B/R Energy Partners, Inc..

246. The three cent ($.03) marketing fee assessed by B/R Energy Partners, Inc. was not reasonable.

247. Simmons' election of Proposal 2 in the P-2 and the alleged statements of John Byrom regarding his seeing no value in enhanced liquid recoveries and wanting to maintain the status quo, did not establish the parties' intentions were to enter the 1996 Gas Contract (P-2, P-3)

based on an accounting methodology premised on the processing at the Chaco plant prior to its conversion to a cryogenic facility and under the Chaco/Blanco split (i.e "Old-Chaco").

248. The use of Mont Belvieu OPIS monthly averages as the pricing basis under the 1995, 1996 and 1996 Gas Contracts is reasonable and proper.

249. There is no offset to which B/R Energy Partners, Inc. is entitled.

250. Simmons did not know that the terms of the GPAS agreements between El Paso Field Services and the downstream gas purchasers (and B/R Energy Partners, Inc.), included the terms of compensation of the gas processors for processing the gas.

251. Simmons was not negligent in negotiating and approving contracts for the sale of its natural gas production.

252. The injury to Simmons in the imposition of interest charged for its not timely paying proper royalty to the United States and for not timely paying proper production taxes to jurisdictions in New Mexico caused by the breaches of contract and tortious conduct set forth above were foreseeable to Defendants at the time of executing the contracts and committing the acts.

253. In accordance with Memorandum Opinion and Order filed April 17, 2002 (Doc. No. 135), it is established fact that Defendant B/R Energy Partners, Inc. is the alter ego of Defendant Broaddus.

254. In accordance with Memorandum Opinion and Order filed April 17, 2002 (Doc. No. 135) it is established fact that Defendant Broaddus is personally responsible for the acts and omissions of Defendant B/R Energy Partners, Inc.

## CONCLUSIONS OF LAW

1. Applying the *Erie* doctrine, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), under New Mexico conflict of law rules, either the common law of the State of New Mexico

(*i.e.*, the state where the events occurred) or the law of the State of Texas, (the state of incorporation of B/R Energy Partners, Inc.) may apply with respect to claims of piercing the corporate veil of B/R Energy Partners, Inc.

2.    Under New Mexico law, the basis for determining whether to pierce the corporate veil and impose personal liability upon shareholders and directors is the alter ego doctrine, which includes elements of domination or instrumentality, improper purpose, and proximate cause. The above facts establish a basis for piercing the corporate veil of B/R Energy Partners, Inc. under New Mexico law. In *Garcia v. Coffman*, 946 P.2d 216 (N.M. Ct. App. 1997), that opinion addressed the elements necessary to pierce the corporate veil under New Mexico law and weighed the sufficiency of the evidence. "Instrumentality or dominion" is shown by evidence of complete domination, not only of the finances, but of the policy and business practices of the entity in respect to the transactions attacked. With respect to "improper purposes", improper purposes may be established by the misrepresentation of a corporation's assets and purposes, the corporation's participation or direction of improper activities and joint improper acts, such as where the party and the subservient corporation cooperate to perform a series of actions, which, if all such actions were performed by either alone, would create liability, or where the corporate owner directly participates in fraudulent conduct or to otherwise commits a wrongful act against the person seeking to disregard the corporate entity. For "proximate cause" it is sufficient to show some knowing and cooperative effort between the related parties which results in an unjust injury to the plaintiff, even though it may not be possible to prove that the defendant's control directly caused the plaintiff's injury.

Further, undercapitalization is a factor which may be considered in determining whether there is a domination or instrumentality as well as whether there was an improper purpose.

*Harlow v. Fibron Corp.*, 671 P.2d 40 (N.M. Ct. App. 1983), *See also Scott v. Azle Resources, Inc.*, 753 P.2d 897 (N.M. 1988).

3.      Under Texas law, TEX. BUS. CORP. ACT ANN. art. 2.21 (Vernon Supp. 2002) preempts most common law bases for piercing the corporate veil, when the claim is contractual or contractually based.  The requisite elements of Article 2.21 include the shareholder causing the corporation to perpetrate an actual fraud on the party, the corporation perpetrating the actual fraud, and the fraud being for the personal benefit of the shareholder.  The above facts establish liability under Article 2.21 of the TEX. BUS. CORP. ACT.  Moreover, Article 2.21 does not preempt other statutes which impose liability against directors or shareholders.

4.      If Texas law is applicable, Simmons' claims for fraudulent transfers and Broaddus' denuding the assets of B/R Energy Partners, Inc. are not subject to TEX. BUS. CORP. ACT ANN. art. 2.21 (Vernon Supp. 2002).

5.      The proper construction of the 1995 Gas Contract's terms regarding a liquid credit include the parties' intentions as to the factors to be considered in calculating the liquid credit are set forth above in the Findings of Fact Nos. 12 and 47, and the trade usage of liquid credit as found in Findings of Fact No. 40.  Parol evidence as to deducting gallons recovered in the liquid credit by a liquid retention or by calculating molecular percentages of liquid recoveries based on an "Old Chaco – non-cryogenic method" should not be admitted to construe in the 1995 Gas Contract.

6.      The proper construction of the 1996 Gas Contract's terms regarding a liquid credit are set forth above in the Findings of Fact No. 25, *i.e.*, the express terms of a complete, integrated contract, which terms the Court finds to be unambiguous.  Parol evidence as to deducting gallons recovered in the liquid credit by a liquid retention or by calculating molecular

percentages of liquid recoveries based on an "Old Chaco – non-cryogenic method" should not be admitted to construe in the 1996 Gas Contract.

7.    The proper construction of the 1998 Gas Contract's terms regarding a liquid credit are set forth above in the Findings of Fact No. 26, *i.e.*, the express terms of a complete, integrated contract, which terms the Court finds to be unambiguous. Parol evidence regarding deducting gallons recovered in the liquid credit by a liquid retention should not be admitted to construe the 1998 Gas Contract.

8.    With respect to the 1995, 1996 and 1998 Gas Contracts as "wellhead contracts", the purchaser of the liquids, (*i.e.*, B/R Energy Partners, Inc.) may not charge a "marketing fee" for its own purchase of the liquids from Simmons, or the resale of the liquids when no third party marketer is involved.

9.    Pursuant to TEX. BUS. CORP. ACT ANN. art. 7.12 (Vernon Supp. 2002), B/R Energy Partners, Inc.'s corporate existence survives dissolution for the purpose of defending in its corporate name any action against the corporation.

10.    Under the 1995 Gas Contract, B/R Energy Partners, Inc., acted as a fiduciary to Simmons in holding funds due Simmons in connection with the liquid credits, and had a duty to properly account for all of Simmons' funds which B/R Energy Partners, Inc. held, to protect the contractual rights of Simmons and to distribute funds honestly and completely.

11.    Under the 1996 Gas Contract, B/R Energy Partners, Inc., acted as a fiduciary to Simmons in holding funds due Simmons in connection with the liquid credits, and had a duty to properly account for all of Simmons' funds which B/R Energy Partners, Inc. held, to protect the contractual rights of Simmons and to distribute funds honestly and completely.

12. Under the 1998 Gas Contract, B/R Energy Partners, Inc., acted as a fiduciary to Simmons in holding funds due Simmons in connection with the liquid credits, and had a duty to properly account for all of Simmons' funds which B/R Energy Partners, Inc. held, to protect the contractual rights of Simmons and to distribute funds honestly and completely.

13. The proper measure of damages for a breach of contract, breach of good faith and fair dealing, and breach of fiduciary duty under New Mexico law based on the facts is that the seller of the liquids, (*i.e.*, Simmons) may recover the loss of its benefit of bargain as damages (*i.e.*, the difference in dollars and cents between the amount that it should have been received under the terms of the 1995, 1996 and 1998 Gas Contracts and what, in fact, it was paid under each contract) and, in addition, recover special damages resulting from interest charges payments it will be required to pay the United States for late payment of royalties and interest charges assessed by jurisdictions in the State of New Mexico for late payment of production taxes.

14. The proper measure of damages under New Mexico law for fraud includes loss of benefit of the bargain damages. Special damages for interest which will be assessed Simmons for late payments of royalties due the United States government and production taxes due the State of New Mexico should be included as damages.

15. The proper measure of damages under New Mexico law for the claims of conversion is the market value of the gallons of liquids not accounted for at the wellhead and at the time of their conversion; but inasmuch as conversion is a continuing tort and the market value of the liquid components are of a fluctuating nature, the highest market value of the gallons converted from the times of conversion until the time of this suit was commenced is proper. Furthermore, upon a finding that the conversion was willful, malicious, or knowing that one was taking another's property, a converter is liable for the value of the liquids as improved by his

labor and without any allowance for the costs of processing the liquids. In addition, special damages may be recovered.

16.    The proper interest rate to be charged for pre-judgment interest under New Mexico law is 15.0% per annum for the general, benefit of the bargain damages and 10% per annum for the consequential, special damages.

17.    B/R Energy Partners, Inc. was in a fiduciary relationship with Simmons in connection with its agreement under the 1995, 1996 and 1998 Gas Contracts to sell the liquids extracted from The Long Trusts' share of production, hold the proceeds, and account to Simmons for a liquid credit.

18.    Under New Mexico law, a promise made with a present intention not to perform may constitute fraud.

19.    The cause of action known as denuding the assets of a corporation is actionable both under New Mexico and Texas law.

20.    Under New Mexico law, the parol evidence rule bars the admission of evidence as to an oral understanding or agreement which is in conflict with the written terms of an unambiguous, integrated contract. Parol evidence is inadmissible under N.M. STAT. ANN. § 55-2-202 (Miche 1985) with respect to (1) whether the "Old Chaco" or 'non-cryogenic methodology' should be applied to the 1996 Gas Contract and (2) whether the prior contracts of Simmons' with others and performance under those contracts created a course of performance modifying the liquid credit by permitting a deduction for gallons paid in the form of a "liquid retention" from the gallons to be calculated for the liquid credit, (which course of performance was without Simmons' knowledge) which conflicts with the express language of the contracts at issue and trade usage.

21.     The gallons of liquids extracted and recovered from the gas stream but not accounted for by B/R Energy Partners, Inc. to Simmons in the liquid credit are personal property interests for which a claim of conversion may arise under New Mexico law. That is, there is a proper claim for conversion of such liquid components not accounted for by B/R Energy Partners, Inc. even following its purchase of the gas stream and title to the liquids passing to B/R Energy.

22.     Under New Mexico law, a corporation or a successor corporation to a party to a contract, such as Phoenix can be liable for a breach of contract, where the successor is formed merely to continue the business of a prior company and whether both corporations have essentially the same shareholders and directors and the properties of the one corporation are transferred to the other.

23.     The evidence establishes grounds for piercing the corporate veil of B/R Energy Partners, Inc. under New Mexico law and Texas law.

## TRIAL BRIEF IN SUPPORT OF CONCLUSIONS OF LAW
### A. CHOICE OF LAW ON CLAIMS AGAINST BROADDUS

1.     Inasmuch as this is a removal action based on diversity, this Court is to review the choice of law issue by the conflict of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). At issue here is whether the conflict of law rules of New Mexico would apply the most significant relationship test in determining which state's laws with respect to piercing the corporate veil or whether New Mexico would apply the traditional rule that the laws of the state of incorporation regarding piercing the corporate veil apply. The courts of New Mexico have not addressed whether New Mexico will follow the most significant relationship test or the traditional rule to this situation. With that said, the Tenth Circuit in *Yoder v. Honeywell, Inc.*, 104 F.3d 1215 (10th Cir. 1997) when confronted with a similar choice of law

question to determine which law to apply as to whether the corporate form was to be disregarded, elected to follow the law of the state which had the most significant relationship, *i.e.*, the state where the events occurred, due to the inter-relationship of such claims with the tort claims in the action. *Id.* at 1220. The rationale for applying the law of the state of incorporation is founded on the internal affairs doctrine. Under the internal affairs doctrine, the law of the state of incorporation is more appropriate for issues of internal corporate governance, such as veil piercing and shareholder derivative claims, because they are premised on the failure of the corporation to operate in accordance with the laws of the incorporating state. "Internal matters of corporate governance are governed by the law of the state of incorporation." WILLIAM MEADE FLETCHER, FLETHER CYC. CORP. § 4223.50 at 30 (Perm. ed. 1999). However, when a corporation's internal affairs are not an integral issue in the claim; that is, where the claim is not premised on "'matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders . . . .'" the applicable law is that of the state with the most significant relationship, not the state of incorporation. *Askanase v. Fatjo*, 130 F.3d 657, 670-71 (5th Cir. 1997) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)). Inasmuch as Simmons' claims of fraud and conversion are interrelated with the alter ego doctrine and its elements of improper purpose. New Mexico's law on piercing the corporate veil should apply.

In *Goya Foods, Inc. v. Unanue – Casal*, 982 F. Supp. 103 (D.P.R. 1997), that court held that in determining the choice of law to apply in a suit regarding the issue of piercing the corporate veil, the significant contacts to be considered include the party's place of incorporation and business, the place where the injurious conduct occurred, the place where the injury materialized, and the place where the relationship between the parties is centered. *Id.* at 107. Under such analysis, for all factors other than the state of incorporation, New Mexico law would

apply. It is the place of business of D.J. Simmons, and is the state where most of the business of B/R Energy Partners, Inc. occurred. No business of B/R Energy Partners, Inc. appeared to take place in Texas. New Mexico is the place where the injurious conduct occurred, New Mexico is the place where the injury materialized, and New Mexico is the place where the relationship between the parties was centered.

In other cases where the issue of choice of law on piercing the corporate veil has arisen in contexts outside the reach of internal affairs doctrine, those courts have followed the most significant relationship test. In *RRX Indus., Inc. v. Lab-Con., Inc.*, 772 F.2d 543 (9th Cir. 1985), the Ninth Circuit followed the law of the jurisdiction where the injury occurred. *Id.* at 546. Similarly in *Secon Serv. Sys., Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406 (7th Cir. 1988), the Seventh Circuit applied the most significant interest analysis on the choice of law as to piercing the corporate veil, in a context where the internal affairs of the corporation was not an integral issue, *id.* at 412-13. In that action, the court noted that every factor except the place of incorporation pointed to the forum state and therefore applied the substantive law of the forum on piercing the corporate veil. In this case, B/R Energy Partners, Inc., though incorporated in the state of Texas, has its principal place of business in Tulsa, Oklahoma and was primarily doing business in the San Juan Basin in New Mexico. New Mexico is the location where the contracts were executed, performed and breached and where the tortious conduct occurred, and the only known contact of the State of Texas with B/R Energy Partners, Inc., other than being the state of incorporation, is perhaps receipt of franchise taxes.

Texas seems to have little interest in imposing its laws on piercing the corporate veil to a Texas corporation in name only, such as in this case. Whereas, New Mexico, being the state where the activity occurred, has a significant interest in seeing that its citizens are not wronged

by a foreign corporation and left remediless. With that said, Simmons will nevertheless analyze the causes of action imposing personal liability against Broaddus both under New Mexico and Texas law.

## B. TEXAS LAW ON PIERCING THE CORPORATE VEIL

2.     If applicable, the preemptive bar of TEX. BUS. CORP. ACT. ANN. art. 2.21 (Vernon Supp. 2002) covers claims based on any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the shareholder is or was the alter ego, on the basis of actual fraud or constructive fraud, a sham to perpetuate a fraud or other similar theory, unless the obligee demonstrates that the shareholder caused the corporation to be used for the purposes of perpetuating and did perpetuate an actual fraud on the obligee primarily for the direct personal benefit of the shareholder. Therefore, if Texas law on piercing the corporate veil is to be applied, concepts similar to New Mexico's law of alter ego would not be applicable. However, Simmons' claims of actual fraud perpetuated and caused by Broaddus utilizing B/R Energy Partners, Inc. for Broaddus' direct personal benefit, would not be preempted by Article 2.21, nor would Simmons' claims of tortious conversion. Even if Texas law is applicable, many of Simmons' claims against Broaddus are not subject to preemption by TEX. BUS. CORP. ACT. ANN. art. 2.21 (Vernon Supp. 2002). Article 2.21 purports to be exclusive and preemptive of any "piercing" liability imposed upon a shareholder of a Texas corporation for the wrongs of the corporation, with certain stated exceptions. The comments to the Article 2.21 make clear that the alter ego doctrine, the single business enterprise doctrine, and other similar theories are preempted by the statute, when applicable. However, Article 2.21, by its terms, does not exempt a shareholder if he is otherwise liable for the obligation <u>under another applicable statute</u>. Other applicable statutes would include fraudulent transfer statutes; therefore, Article 2.21 would not affect the application of the New Mexico Fraudulent Transfer Statute to this case. Likewise, a

cause of action against denuding the assets of a corporation is based on statutes, TEX. BUS. CORP. ACT ANN. art. 6.04 and 7.12(B) or N.M. STAT. ANN. §§ 53-16-6 and 56-10-14, and is similarly unaffected by Article 2.21.

While Article 2.21 purports to address alter ego, single business enterprise and other similar doctrines, several opinions of Texas and other jurisdictions strongly infer, if not hold, that an action against denuding the assets of a corporation is not a corporate piercing doctrine; hence, Article 2.21 of TEX. BUS. CORP. ACT. ANN. would not apply. In *Castleberry v. Branscum*, 721 S.W. 2d 270, 271 n.1 (Tex. 1986), the Texas Supreme Court distinguished several theories from those that "pierce the corporate veil", such doctrines included the denuding the assets doctrine, fraudulent transfers, the trust fund doctrine, and breaches of fiduciary duty. The Texas Supreme Court noted that, while such doctrines, including the denuding theory have similar effect, claims for disregarding the corporate fiction have different elements, terms and remedies and that they protect different parties and interests and at different times than the other theories. *Id.* In *In Re MortgageAmerica Corp. v. MortgageAmerica Corp.*, 714 F.2d 1266, 1271 (5th Cir. 1983), the Fifth Circuit, applying Texas law, held that a claim against denuding the assets of a corporation is substantially a restatement of the "corporate trust fund" doctrine, but in different terms. The court noted one distinction being that courts appear to use the denuding approach when the debtor corporation had not actually been insolvent, when the allegedly improper transfer of corporate assets occurred. The court also noted that such doctrines are applied, because the shareholder's receipt of the dissolved corporation's assets generally arise only when the shareholder has impaired the creditor's equitable lien and the shareholder should be held liable in equity for the full value for the assets he received. In *Menetti v. Chavers*, 974 S.W.2d 168 (Tex. App.–San Antonio 1998), also applying Article 2.21, that court

distinguished application of the trust fund doctrine from corporate piercing theories under Article 2.21. *Id.* at 175. In *Huff v. Harrell*, 941 S.W.2d 230, 235 (Tex. App.--Corpus Christi 1996) that court distinguished between claims falling within Article 2.21's preemption, and a claim against denuding the assets of a corporation or the corporate trust fund doctrine. *Id.* at 235. It noted that under the Texas Business Corporation Act Article 6.04(A)(3), when a corporation dissolves, its assets are to be applied, so far as they will go, in satisfaction of debts, obligations, and liabilities existing at the time of dissolution, and found the corporate creditors having priority to the assets over shareholders and if a preferential transfer of corporate assets is made, the creditor is able to pursue the assets and subject <u>the assets</u> to payment of their claims, as distinguished from a corporate piercing doctrine. *Id.* *See also Francis v. Beaudry*, 733 S.W.2d. 331, 335 (Tex. Civ. App.--Dallas 1987).

### C. THE CAUSE OF ACTION KNOWN AS DENUDING THE ASSETS OF A CORPORATION IS LIKEWISE ACTIONABLE UNDER NEW MEXICO LAW

3.    Based upon *Erie* considerations, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), Simmons' cause of action against Broaddus for denuding the assets of a corporation is recognized in New Mexico, as it is a variant of the "corporate trust fund" doctrine and it is based on N.M. STAT. ANN. §§ 53-16-6 and 56-10-14. *See Askanase v. Fatjo*, 130 F.3d 657, 670-71 (5th Cir. 1997) (Trust fund claims involve the rights of third party creditors not the internal affairs of the corporation.). In fact, the cause of action is recognized throughout the United States. *See Pierce v. United States*, 255 U.S. 398 (1920); *Regal Ware, Inc. v. Fidelity Corp.*, 550 F.2d 934 (4th Cir. 1975); *Central State Southeast & Southwest Areas Pension Fund v. Minneapolis Van & Warehouse Co.*, 764 F. Supp. 1289 (N.D. Ill. 1991)(applying Minnesota law); *World Broadcasting System, Inc. v. Bass*, 328 S.W.2d 863 (Tex. 1959); *Ex Rel Thompson v. City of Green Castle*, 40 N.E. 2d 388 (Ind. 1942); *Davis v. Hemming*, 127 A. 514 (Conn. 1925). In

*Pierce v. United States*, 255 U.S. 398 (1921), the United States Supreme Court recognized the doctrine as part of the general common law. Further, in *Central States Southeast & Southwest Areas Pension Fund v. Minneapolis Van & Warehouse Co.*, 764 F. Supp. 1289 (N.D. Ill. 1991), that court held that corporate "veil piercing" is not even at issue in an action against denuding the assets of a corporation, in that once a company has dissolved, there is no longer a veil to be pierced. "Rather, what is involved is a basic tenant of corporate law: '[w]hen the assets of a corporation are distributed to its shareholders leaving corporate debts unpaid, the liability of the shareholders to a creditor, to the extent of the value of the assets received, is beyond question.' Any such distribution of assets is deemed a fraud on creditors . . . That universal rule of stockholder liability is simply a function of the basic concept that stockholders are remaindermen – that their interest is only in the equity, only in what is left over after all the corporate obligations have been paid." *Id.* at 1294 (emphasis in original).

### D. PROPER CONSTRUCTION OF 1995 GAS CONTRACT

4.       A review of the 1995 Gas Contract shows that it was intended as the final written expressions of their agreement and, inasmuch as the terms of the liquid credit in the 1995 Gas Contract have been judicially admitted by Defendants, *see* FED. R. CIV. P. 8(d), such terms may not be contradicted or varied by evidence of a prior agreement, (especially a prior agreement only involving one of the parties to the Gas Contracts). N.M. STAT. ANN. § 55-2-202 (Miche 1978). Further, inasmuch as such terms were intended to be the complete and exclusive statement of the terms of the agreement, unless the evidence is probative of a course of dealing between the parties to the Gas Contracts, a course of performance between them, or a trade usage, introduced to explain or supplement the writing, N.M. STAT. ANN. § 55-2-202 excludes all other extrinsic evidence, including evidence of additional, consistent terms, to explain the writing. *Rio Grande Jewelers Supply, Inc. v. Data General Corp.*, 689 P.2d 1269, 1270-71

(N.M. 1984); J. WHITE AND R. SUMMERS, HANDBOOK OF THE LAW UNDER THE UNIFORM COMMERCIAL CODE, § 2-9, 2-10 (2d ed. 1980). The proper construction of the 1995 Gas Contract's terms regarding a liquid credit includes the parties' intentions as expressed in the written contract and the trade usage of liquid credit as factors to be considered in explaining and supplementing the meaning of a liquid credit. N. M. STAT. ANN. § 55-2-202. It is anticipated that Defendants will argue that testimony of Simmons' gas contracts with third parties, both before and after the three gas contracts with B/R Energy, and transactions under those contracts, should also be admitted to construe the Gas Contracts. While the 1995 Gas Contract differs from the 1996 Gas Contract and the 1998 Gas Contract, as its terms regarding the liquid credit are abbreviated - "Seller shall receive a liquid credit." – Defendants' testimony offered to construe the 1995 Gas Contract is inadmissible under N.M. STAT. ANN. § 55-2-202. That is, inasmuch as during the course of performance of the 1995 Gas Contract, there was no disclosure to Simmons that an amount greater than or equal to the gallons taken in a liquid retention were used to reduce the reported amount of actual gallons of the liquid components recovered, deducting such gallons from the liquid credit was not part of the parties' course of performance. N.M. STAT. ANN. § 55-2-208 requires Simmons' <u>knowledge</u> of and acquiescence in the nature of the performance (*i.e*, in B/R Energy's accounting for the liquid credit, reducing the actual gallons recovered by an amount greater than or equal to the gallons taken in the liquid retention, and reporting that amount of gallons as the proper amount of gallons to calculate the liquid credit) before such could became part of the parties' course of performance. There will be no evidence of Simmons' knowledge of such during the term of the 1995 Gas Contract. Further, there was no "course of dealing" between Simmons and B/R Energy Partners, Inc. prior to the 1995 Gas Contract. B/R Energy and Simmons were not dealing together as parties to any Gas Contract prior to the 1995

Gas Contract. The Court can only look to the industry "trade usage" of the term liquid credit (as found in Finding the Fact No. 40) to construe the "liquid credit" language in the 1995 Gas Contract. N.M. STAT. ANN. § 55-1-205, 2-202. Tat is, only the express terms of the 1995 Gas Contract and the industry's trade usage as to the meaning of "liquid credit" are admissible to construe the 1995 Gas Contract.

### E. PROPER CONSTRUCTION OF THE 1996 GAS CONTRACT

5.     The proper construction of the 1996 Gas Contract's terms regarding a liquid credit are found solely in the written documents forming the 1996 Gas Contract . Inasmuch as a review of the 1996 Gas Contract shows that it was intended as the final written expression of the agreements and inasmuch as the terms of the liquid credit in the 1996 Gas Contract have been judicially admitted by Defendants, *see* FED. R. CIV. P. 8(d), such terms may not be contradicted or varied by evidence of a prior agreement, (especially a prior agreement only involving one of the parties to the Gas Contracts). N.M. STAT. ANN. § 55-2-202. Inasmuch as such terms were intended to be the complete and exclusive statement of the terms of the agreement, unless evidence is probative of a course of dealing between the parties to the Gas Contracts, a course of performance between them, or a trade usage, introduced to explain or supplement the writing, N.M. STAT. ANN. § 55-2-202 excludes all other extrinsic evidence, including evidence of additional, consistent terms, to explain the writing. *Rio Grande Jewelers Supply, Inc. v. Data General Corp.*, 689 P.2d 1269, 1270-71 (N.M. 1984); J. WHITE AND R. SUMMERS, HANDBOOK OF THE LAW UNDER THE UNIFORM COMMERCIAL CODE, § 2-9, 2-10 (2d ed. 1980).

6.     It is anticipated that Defendants will argue that not only testimony of prior and subsequent unrelated contracts are admissible to construe the 1996 Gas Contract's terms (as noted above), but also testimony of an oral or implied agreement that the gas and liquids would be calculated as if the gas had been processed at an non-cryogenic plant ("Old Chaco"), and not

based on the current molecular averages as determined by El Paso Field Services at the El Paso Chaco cryogenic plant, would be used in accounting to Simmons under the 1996 Gas Contract, should be admitted. Such oral or implied agreement is at variance with the express terms of the 1996 Gas Contract and that "Recoveries are based upon current mole percent averages provided by EPFS..." (P-2), Defendants' proposed parol evidence testimony is inadmissible parol evidence under N.M. STAT. ANN. § 55-2-202.

7.     It is also anticipated that Defendants will argue that parol testimony that the liquid credit was to be calculated not based on the actual gallons of each liquid component recovered after processing the gas, but rather based on whatever gallons B/R Energy Partners, Inc. received from El Paso Field Services, after liquid retentions were taken by the gas processors, should be admitted. That is, unbeknownst to Simmons, B/R Energy compensated the gas processors for processing the gas, by conveying a percentage of the gallons of the liquids to them, in lieu of paying a processing fee, and only reported to Simmons at most the net gallons it received from the gas processors after the liquid retention had been taken, but charging Simmons a processing fee for such services as well. Such parol testimony is inadmissible under N.M. STAT. ANN. § 55-2-202 as it conflicts with the express terms of the 1996 Gas Contract "...Buyer shall pay Seller liquid credits attributable to 100% of such production." (P-3)

8.     B/R Energy will argue that in prior contracts which Simmons entered into with others, part of the compensation which purchasers of Simmons' gas paid their gas processors was in the form of a liquid retention. B/R Energy knew this because it was acting as marketing agent for such purchasers. But the evidence also establishes that Simmons never knew of any deductions taken in determining the gallons of liquid components in calculating the liquid credit under prior contracts or that the gallons of liquids which other purchasers accounted to Simmons

were being underreported. Thus, such evidence does not evidence a course of performance under those contracts, N. M. STAT. ANN. §55-2.208 and hence, could not be a course of dealing. N. M. STAT. ANN. §55-2.105. Again, such evidence is parol evidence at variance with the express terms of the 1996 Gas Contract.

9.     In our claim, the 1996 Gas Contract expressly provided that the liquid credit was to be on 100% of production, and that the gallons of liquids to be reported in the liquid credit were the "liquid recoveries". Such express language can not be contradicted by Defendants' parol evidence. The court should construe the express terms regarding a liquid credit and proper deductions under the contract, as set forth the 1996 Gas Contract (Finding of Fact No. 25), without admitting parol evidence. Finally, although there was, in fact, no such oral or implied understanding that B/R Energy could account to Simmons on liquid recoveries based upon an Old Chaco or non-cryogenic methodology, N.M. STAT. ANN. § 55-2-202 renders such testimony at variance with the express language of the 1996 Gas Contract inadmissible.

### F. PROPER CONSTRUCTION OF THE 1998 GAS CONTRACT

10.     The proper construction of the 1998 Gas Contract's terms regarding a liquid credit is that found within the 1998 Gas Contract, as set forth in Finding of Fact No. 26, and its terms are clear. It is anticipated that Defendants will argue that the same parole evidence regarding the liquid retention should be admitted to construe the 1998 Gas Contract as what argued for the 1996 Gas Contract. Inasmuch as a review of the 1998 Gas Contract shows that it was intended as the final written expressions of the agreement and inasmuch as the terms of the liquid credit in each Gas Contract have been judicially admitted by Defendants, *see* FED. R. CIV. P. 8(d), such terms may not be contradicted or varied by parol evidence. N.M. STAT. ANN. § 55-2-202. Further, inasmuch as such terms were intended to be the complete and exclusive statement of the terms of the agreement unless evidence is probative of a course of dealing between the parties to

the Gas Contracts, a course of performance between them, or a trade usage, introduced to _explain_ or supplement the writing, N.M. STAT. ANN. § 55-2-202 excludes all other extrinsic evidence, including evidence of additional circumstantial terms, to explain the writing. *Rio Grande Jewelers Supply, Inc. v. Data General Corp.*, 689 P.2d 1269, 1270-71 (N.M. 1984); J. WHITE AND R. SUMMERS, HANDBOOK OF THE LAW UNDER THE UNIFORM COMMERCIAL CODE, § 2-9, 2-10 (2d ed. 1980).

### G. PROPER CONSTRUCTION OF "MT. BELVIEU" IN THE GAS CONTRACTS

11.    The court should further conclude that Mt. Belvieu OPIS Non-TET averages were in reference to the _monthly_ Mt. Belvieu average prices posted for each liquid component. It is the generally known average posted by Mt. Belvieu. There is not a _posted_ Mt. Belvieu "first 10 day" average. The court should further conclude that the liquid credit was to be calculated using the _actual_ gallons of the liquid components extracted and recovered at the processing plant, without any deduction for an amount equal to the gallons included in the liquid retention charged by the gas processor to its shipper and B/R Energy Partners, Inc. or reduced gallons based on any alleged contrary "oral" understandings, are barred by N.M. STAT. ANN. § 55-2-202.

### H. PROPER CONSTRUCTION OF MARKETING FEES AS DEDUCTIONS IN CALCULATING THE LIQUID CREDIT

12.    By the terms of the 1995, 1996 and 1998 Gas Contracts "wellhead contracts", the purchaser of the liquids, (*i.e.*, B/R Energy Partners, Inc.) may not charge a "marketing fee" for its own purchase of the liquids from Simmons or its resale of the liquids, when no third party marketer is involved and no marketing fee is assessed by a third party.

## I. B/R ENERGY'S LEGAL STATUS

13. Pursuant to TEX. BUS. CORP. ACT ANN. art. 7.12 (Vernon Supp. 2002), B/R Energy Partners, Inc.'s corporate existence survives dissolution for the purpose of defending in its corporate name any action against the corporation.

## J. FIDUCIARY DUTY

14. Under the 1995, 1996 and 1998 Gas Contracts, B/R Energy Partners, Inc., acted as a fiduciary to Simmons in holding funds due Simmons in connection with the liquid credits, and had a duty to properly account for all of Simmons' funds which B/R Energy Partners, Inc. held, to protect the contractual rights of Simmons and to distribute funds honestly and completely.

15. In New Mexico, a fiduciary duty exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing the confidence. *Swallows v. Laney*, 102 N.M. 81, 691 P.2d 874 (1984), citing *Starkweather v. Shaffer*, 262 Ore. 198, 497 P.2d 358 (1972). "The general rule is that he who undertakes to act for another in any matter of trust or confidence shall not in the same matter act for himself against the interest of the one relying upon his integrity. . . .'" *Salter v. Jameson*, 736 P.2d 989, 991 (N.M. Ct. App. 1987) (quoting *Las Luminarias of N.M. Council of the Blind v. Isengard*, 587 P.2d 444, 449 (N.M. Ct. App. 1978)). *Salter* involved an employee competing with his employer while still employed by diverting business to his new business, copying and taking files, and other similar misconduct. The court found that an employee owed a fiduciary duty to his employer and found that this was a violation of that duty. *Id.* However, the court suggested that even if the defendant had been an independent contractor as opposed to an employee, the result would likely have been the same. *Id.* ("Defendant does not explain why an independent contractor, as opposed to an employee, owes no duty of loyalty and

cites no authority that there is any difference. Nevertheless, assuming defendant is correct, that an independent contractor owes a lesser duty or no duty at all, it would not matter here."). A fiduciary duty, as viewed by New Mexico courts, is a duty of loyalty. *Moody v. Stribling*, 127 N.M. 630, 985 P.2d 1210 (1997 NMSC 052). The fiduciary must, as a part of his charge, reveal all facts within his knowledge that might affect decisions of those that he serves; he stands in a position of great trust and confidence and must act in utmost good faith. *Swallows v. Laney, supra. See also Moser v. Bertram*, 115 N.M. 766, 858 P.2d 854 (1996).

16.     A fiduciary breaches his duty by placing his interests above those of the beneficiary to the detriment of that beneficiary. *Kueffer v. Kueffer,* 110 N.M. 10, 731 Pl.d 461 (1990); *Gelfand v. Horizons Corp.*, 675 F.2d 1108 (10 Cir. 1982). The breach is actionable when it results in a direct injury to the beneficiary. *Fate v. Owens*, 130 N.M. 503, 27 P.3d 990 (2001 NMCA 040).

### K. MEASURE OF DAMAGES FOR BREACH OF CONTRACT, BREACH OF GOOD FAITH AND BREACH OF FIDUCIARY DUTY

17.     The proper measure of damages for a breach of contract under New Mexico law under our facts is that Simmons, as the seller of the liquids may recover its loss of the benefit of bargain damages (*i.e.*, the difference in dollars and cents between the amount that should have been received under the terms of the 1995, 1996 and 1998 Gas Contracts and what, in fact, it was paid under each contract) and, in addition, recover special damages resulting from interest charges payments it will be required to pay the United States for late payment of royalties and interest assessed by jurisdictions in the State of New Mexico for late payment of production taxes. The measure of damages in New Mexico is essentially the same under tort or contract theory, so the same measure of damages applies to the breach of good faith and fair dealing claims as well as the breach of fiduciary duty claims. *Central Security & Alarm Co., Inc. v.*

*Mehler*, 819 P.2d 1340, 1346-47, (N.M. Ct. App. 1996). The purpose of compensatory damages is to make the injured party whole by compensating it for its losses. *Central Security & Alarm Co., Inc. v. Mehler*, 819 P.2d 1340, 1346-47, (N.M. Ct. App. 1996). The rule as to the measure of damages for breach of contract is the same for all contracts. A party injured by a breach of contract is entitled to recover all of his damages, including gains prevented as well as losses sustained, provided they are certain to follow from the breach. *Strada Production Co. v. Mercury Exploration Co.*, 916 P.2d 832 (N.M. 1996). In addition to general damages, consequential or special damages are recoverable as long as the loss was foreseeable by the breaching party at the time the contract was entered. *Torrence County Mental Health Program, Inc. v. New Mexico Health & Environmental Dept.*, 830 P.2d 145, 153-54 (N.M. 1992); *First National Bank in Albuquerque v. Sanchez*, 185 P.2d 613, 618 (N.M. 1991).

18. Courts have, when examining damages to be assessed in cases involving breaches of fiduciary duties, reminded triers of fact that the purpose of such damages is to make the injured whole by compensating that person for all losses and in placing the person in as good a position as if the harm or injury had not occurred. *Moody v. Stribling, supra.* Put another way, the measures of damage in such cases are all damages that are the natural and probable consequences of the breach. *U.S. Industries, Inc. v. Touche Ross & Co.*, 854 F.2d 1223 (10th Cir. 1988).

19. New Mexico also recognizes the right to collect punitive damages when breaches of fiduciary duties involve a "culpable mental state" on the part of the Defendant. *Walta v. Gallegos Law Firm,* 40 P.3d 449 (2002 NMCA 015). Punitive damages have been held to have been properly awarded when the fiduciary misrepresents his intentions, when his actions are

motivated by a desire to help himself at the expense of the person that he is charged to protect, and where actual damages result. *Walta v. Gallegos Law Firm, supra.*

## L. PROPER MEASURE OF DAMAGES FOR FRAUD

20.     The proper measure of damages under New Mexico law for fraud, include general damages for loss of benefit of the bargain, as well as special damages for interest and penalties which will be assessed Simmons for late payments of royalties due the United States Government and production taxes due the State of New Mexico. When fraud is proven, both actual and special damages are recoverable. *Industrial Supply Co. v. Goen,* 276 P.2d 509 (N.M. 1954). Actual damages for loss of the benefit of the bargain in the typical fraud cases is the difference between the value represented and the actual value. *Stewart v. Potter,* 104 P.2d 736 (N.M. 1940).

## M. PROPER MEASURE OF DAMAGES FOR CONVERSION

21.     The proper measure of damages under New Mexico law for the claims of conversion includes the "value of the subject matter . . . at the time and place of the conversion or a different value where that is necessary to give just compensation." *Broad Court Capital Corp. v. Suma Medical Corp.,* 972 F.2d 1183, 1192 (10th Cir. 1992).

22.     New Mexico also recognizes that the measure of damages for conversion may differ when the market value of the subject converted is of a fluctuating nature and in such event, the market value at the highest market value between the time of the conversion and the time of trial, may be used. *Goesling v. Gross, Kelly & Co.,* 113 P. 608, 609 (N.M. 1910). Inasmuch as conversion is a continuing tort, *see Southern Union Co. v. Southwest Gas Corp.,* 165 F.Supp. 1010, 1021 (Ariz. 2001); *Devries v. Brumback,* 349 P.2d 532, 535 (Cal. 1960), New Mexico is consistent with other jurisdictions in holding that conversion of personal property of a fluctuating value, especially when the conversion is intentional or malicious, results in a different measure

of damages based upon the highest market value of the chattel from the time of conversion to the time of trial or institution of suit. *DeShazo v. Wool Growers Central Storage Co.*, 162 S.W.2d 401, 404, (Tex. 1942); *Burmasal Co. v. Lake*, 272 S.W.2d 582 (Tex. Civ. App.-El Paso 1925); *Romano v. Dempsey-Tegeler & Co., Inc.*, 540 S.W.2d 538 (Tex. Civ. App.–Houston, 14th Dist. 1976).

23. No New Mexico opinions address whether one who converts property and increases the value of the property through his own effort and expense is entitled for a credit for the increased value. However, it is the almost universal rule in those jurisdictions that have addressed this issue, that a willful converter is not entitled to the increased value of the property or, in other words, any deduction from the market value of the converted property to negate its increased value. In *Western Nat. Bank of Casper v. Harrison*, 577 P.2d 635 (Wy. 1978) that court held, for example:

> There is substantial authority that if the defendant is a willful or bad faith converter, the measure of damages is the full value of the converted property at the time and place, as enhanced by the converter. *Mineral Resources, Inc. v. Mahnomen Construction Company*, 1971, 289 Minn. 412, 184 N.W.2d 780; *Withers v. Tyler County Lumber Company*, Tex.Civ.App. 1959, 326 S.W.2d 173, error ref., no rev. error; *Baxter House, Inc. v. Rosen*, 1967, 27 A.D.2d 258, 278 N.Y.S.2d 442; *Terry v. Butler*, 1960, 240 La. 398, 123 So.2d 865; *Parker v. Cone*, 1933, 105 Vt. 426, 168 A. 715; 89 C.J.S. Trover and Conversion § 169, p. 647; 18 Am.Jur.2d, Contribution, §94, p. 131, 4 Restatement of the Law, Torts, § 927, p. 651.

*Id.* at 641. *See* CHARLES T. MCCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 126 at 494-97 (1935); *American East India Corp. v. Ideal Shoe Co.*, 400 F. Supp. 141 (E.D. Pa. 1975); *The J. Oswald Boyd*, 53 F. Supp. 103 (E.D. Mich. 1943); *Smith v. Shiflett*, 403 P.2d 364 (Wash. 1965); *Terry v. Butler*, 123 So. 2d 865 (La. 1960); *Loring v. Baker*, 106 N.E.2d 434 (Mass. 1952); *Simmons v. Cochran*, 41 So. 2d 579 (Ala. 1949); *Lawson v. Branch*, 12 S.E.2d 641 (Ga. 1940);

*Parker v. Cone*, 168 A. 715 (Vt. 1933).  *See also See* RESTATEMENT (SECOND) TORTS §

927(2)(a) and cmt. F (1965), which notes:

> When a converter has made additions to or otherwise improved the chattel, the owner may in some cases be able to recover the value of the chattel as thus increased. This is also true when the converter has otherwise enhanced the value of the chattel by his own labor or expenditures, as when he has transported it to a more favorable market or location. Whether the enhanced value can be recovered will depend upon the state of mind of the converter at the time that he does the acts that increase the value.
>
> If the converter's conduct is not in good faith, as when he knows that the chattel is not his when he originally converts it or when he acquires the knowledge before he improves it, a special rule of damages awards to the owner the increase in value that the converter has contributed to the chattel. This rule originated by analogy to the action of replevin, in which the owner could recover back the specific chattel without compensating the converter for the increase in value. It has persisted largely because of a feeling on the part of the courts both that one who willfully intermeddles with the chattel of another should proceed at his peril so far as any claim of his own for allowance or compensation for his acts is concerned and that an intentional converter should not have the prospect of profiting from his wrong.

*Id.* The rationale for this rule is that an intentional wrongdoer should not be allowed to benefit from his misdeed. *See Plikus v. Plikus*, 599 A.2d 392 (Conn. App.--1991). Because B/R Energy willfully converted the liquids from Simmons, it should not be allowed to benefit from its wrong and, therefore, in calculating damages, it should not be entitled to credits against the market value of the liquids at the time the liquids were sold to third parties, for what it contends has been added to the liquids' value following the conversion, including deductions or credits for gathering, dehydration, processing the gas and transportation, fractionation, and marketing the liquids.

### N. PROPER INTEREST DUE

The proper interest rate to be charged under New Mexico law is fifteen percent annually on money due by contract, on money received to the use of another and retained without the owner's consent expressed or implied and on money due upon the settlement of insured accounts

from the day the balance is ascertained. N.M. Stat. Ann. § 56-8-3 (Miche 1978). Otherwise the rate of interest for the special damages is ten percent annually. N.M. Stat. Ann. § 56-8-4 (Miche 1978).

## O. FRAUDULENT PROMISES

24.     Under New Mexico law, a promise made with a present intention not to perform may constitute fraud. In *Werner v. City of Albuquerque*, 229 P.2d 688, 690 (N.M. 1951), the New Mexico Supreme Court held that: "'[f]raud may, in a majority of jurisdictions, be predicated on the non-performance of a promise in certain cases where the promise is the device to accomplish the fraud, the most frequent example of such a fraudulent promise being a promise made without any intention of performing it at the time of making it, . . . .'" *Id.* at 690.

## P. CONVERSION

25.     Liquids within the gas stream at the wellheads but not accounted for by B/R Energy (and the proceeds due from their sale as part of the compensation for the sale of natural gas) are personal property interests for which a claim of conversion may arise under New Mexico law. That is, there can be a claim for conversion of such liquids by B/R Energy Partners, Inc. even after the purchase of the liquids at the wellhead and their extraction at the processing plant. The fact that the liquid components were part of the gas stream at the time of their conversion does not affect the nature of the claims. Several opinions have found conversion of refined products (lumber, ore, oil, and gas) when the act of conversion occurred while the product was in a state of being part of an unprocessed, whole (standing timber, minerals, oil and gas at the wellhead). *Guffy v. Smith*, 237 U.S. 101 (1915); *Spruce River Coal Co. v. Valco Coal Co.*, 120 S.E.302 (W. Va. 1923); *Bender v. Brooks*, 127 S.W. 168 (Tex. 1910); *Greer v. Southern Timber Co.*, 291 F.582, 584 (S.D. Ga. 1923); *Wright v. Skinner*, 16 So. 335

(Fla. 1894); *Ivy Coal and Coke Co. v. Alabama Coal and Coke Co.*, 33 So. 547 (Ala. 1902);

*Galloway Coal Co. v. Bessemer Coal, Iron & Land Co.*, 98 So. 779 (Ala. 1924).

The common law of the several states recognizes that in instances where a conversion has

been effected through fraud, such that the legal title to the chattel has been conveyed to the

converter, a claim of conversion exists. W. PAGE KEETON, PROSSER AND KEETON ON THE LAW

OF TORTS § 15 at 93-94 (5th ed. 1984), provides as follows:

> The same rule has been extended to the acquisition of possession of the chattel by
> fraud, even though title may have passed to the defendant, by means of a rather
> fine spun and anomalous theory which permits the plaintiff to exercise of his own
> motion the equitable remedy of rescission of the transaction and thereafter to
> recover for the wrongful taking as if his consent to it had never been given.

*Id. See also* RESTATEMENT (SECOND) OF TORTS § 252A (1965).

New Mexico follows the common law in this area. In *Bustin v. Craven*, 263 P.2d 392

(N.M. 1953), the New Mexico Supreme Court addressed a situation in which a buyer of an

automobile obtained possession by tendering a worthless check and by falsely representing that

he would return the next day for consummation of the sale. Bustin operated a used car business

in Austin and was approached after business hours by Reed who tendered a check drawn on the

Bank of Austin for the price of an automobile, took the vehicle for a demonstration and promised

to return with the vehicle the following day to consummate the sale. Reed never returned and the

next day Bustin learned that Reed had no account with the Bank of Austin–the check was

worthless. Reed, in turn, sold the automobile to Allen, who unsuccessfully claimed to be a bona

fide purchaser. The New Mexico Supreme Court determined that Reed's purported sale of the

vehicle to Allen was not a sale and Bustin did not lose his rights to the car. The court found that

Reed intended to defraud Bustin from the outset and therefore "the minds of the seller and the

purchaser did not meet on the transaction, and the title to the car remained in the plaintiffs." *Id.*

at 394. Moreover, "misrepresentation of a material fact, even if innocently made, will entitle the party who has justifiably relied thereon to rescind the contract." *Ledbetter v. Webb*, 711 P.2d 874, 877 (N.M. 1985). A partial rescission may be allowed. *Ford v. Norton*, 260 P. 411, 412 (N.M. 1927). Thus, with respect to those gallons of liquid components which were not fraudulently accounted for in the liquid credit, as they were acquired by fraud there should be a partial rescission of the contract as to such gallons in recognizing a conversion claim.

Similarly, in an opinion where a person lawfully came into possession of two vehicles through a contingent sales agreement, once the agreement failed and the owner's demand to return the vehicles was refused, the New Mexico Supreme Court found that a wrongful detention occurred. "The wrongful detention of the property in this case is similar to an act of conversion of personal property. Conversion of personal property is an attempt by the person doing the act to wrongfully transfer the title to himself." *Valley Chevrolet Co. v. Whitaker*, 416 P.2d 154, 155 (N.M. 1966).

While the *Valley Chevrolet* court held that the wrongful detention was *similar* to a conversion, *id.* at 155, wrongful detention subsequently became part of the "standard" definition of conversion in New Mexico law. Where a creditor repossessed a vehicle that contained items of personal property belonging to the debtor and the creditor refused to return the property upon demand, the creditor committed a conversion. "Under New Mexico law, conversion

> is the wrongful possession of, or the exercise of dominion over, a chattel to the exclusion or in defiance of the owner's right thereto; *or* an unauthorized and injurious use thereof; *or* the wrongful detention after demand therefor by the owner."

*Larranga v. Mile High Collection and Recovery Bureau, Inc.*, 780 F. Supp. 780, 782 (D.N.M. 1991) (quoting *Newman v. Basin Motor Co.*, 644 P.2d 553 (N.M. Ct. App. 1982)) (italics in original, underscore emphasis added).

The wrongful detention theory of conversion provides one clear basis for B/R Energy's converting Simmons' liquids. Under this theory, it is not a defense that B/R Energy lawfully came into possession of the liquids pursuant to the contract (without consideration of the fraud issues considered alone). For Simmons to prove conversion, it need only establish that Simmons was in possession of the liquids, that Simmons had a right to possess the liquids because they had not been paid for, that Simmons demanded that B/R Energy return the liquids, and that B/R Energy refused.

Secondly, another basis to establish conversion relevant to this case is found in an opinion where a lessor's use of an airplane to transport illegal drugs was held to be a conversion where the lease contained an express provision prohibiting the use of the airplane for such purposes, because the use was unauthorized. *Gelder v. Puritan Ins. Co.*, 668 P.2d 1117 (N.M. App. 1983).

> Conversion is the wrongful possession of, or the exercise of dominion over, a chattel to the exclusion or in defiance of the owner's right thereto; *or an unauthorized and injurious use thereof*; or the wrongful detention after demand therefor by the owner.

*Id.* at 1118 (emphasis in original).While not every unauthorized use of a chattel constitutes a conversion, *id.*, "there is a conversion 'if the unauthorized use is such a serious violation of the right of another to control the chattel as to make it just to require the actor to pay the full value.'" *Id.* at 1118-19 (quoting RESTATEMENT (SECOND) OF TORTS § 228 cmt. (b) (1965)). In this case, Simmons authorized B/R Energy to take the liquids, but Simmons did not authorize B/R Energy to take the liquids and not account to Simmons for such gallons in the liquid credit, to the exclusion of Simmons' rights in the liquids. B/R Energy's use of the liquids was unauthorized to the extent that B/R Energy evaded accounting for them in the liquid credit. The unauthorized

use was injurious to Simmons as Simmons did not receive the very consideration for which the bargain was made.

## Q. SUCCESSOR CORPORATION'S LIABILITY

26.     A successor corporation to a party to a contract can be liable for a breach of contract, where the successor is formed merely to continue the business of a prior company and whether both corporations have essentially the same shareholders and directors and the properties of the one corporation are transferred to the other.     Again, based upon *Erie* considerations, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), no New Mexico decision is directly on point, it should be the conclusion of this Court that New Mexico would follow the common law jurisdictions that a successor corporation formed merely to continue the business of prior company, where both corporations have essentially the same shareholders and directors and properties and the properties of the one are transferred to the other, results in successor liability. *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d. 543 (9th Cir. 1985).  As *Fletcher Cyclopedia of the Law of Private Corporations* provides,

> Under the doctrine of successor liability, where one corporation succeeds to the assets of another corporation, the buying corporation generally does not take on the liabilities of the selling corporation.   However, under the traditional exceptions, courts will impose tort liability on a buying corporation where (1) there is an agreement by which the buyer assumes the seller's liabilities, (2) there is a de facto merger, (3) the transaction was fraudulent or for less than fair consideration, or (4) the buying corporation is a "mere continuation" of a dissolved selling corporation.  *Golden State Bottling Co., Inc. v. National Labor Relations Board*, 414 US 168, 38 L Ed 2d 388, 94, S Ct 414 (citing this treastise) (successor employer); *First Dakota Nat. Bank*, 137 F3d 1077 (CA8 1998) (applying South Dakota law); *Kaiser Foundation Health Plan of Mid-Atlantic States v. Clary & Moore, P.C.*, 123 F3d 201 (CA4 1997) (applying Virginia law); *Arizona State Carpenters Health and Welfare Trust Fund v. Sanders*, 162 Ariz 116, 781 P2d 594 (1989) (business as successor to predecessor employer); *State of Hawaii, Director of Transportation v. Yamada & Sons, Inc.*, 59 Hawaii 543, 584 P2d 114; *Irwin v. Bertelsmeyer*, 730 SW2d 302 (Mo App); *U.S. v. First Dakota Nat. Bank*, 137 F3d 1077 (CA8 1998).  Similarly, the individual officers, directors, or shareholders of the successor corporation may be held liable under appropriate circumstances.

WILLIAM MEADE FLETCHER, FLETHER CYC. CORP. § 48 at 776-77 (Perm. ed. 1999).

## R. DUTY OF GOOD FAITH AND FAIR DEALING

27.     There is a duty of good faith and fair dealing in every contract in New Mexico.

*Allsups Convenience Stores, Inc. v. North River Ins. Co.*, 976 P.2d 1, 13 (N.M. 1998).

## S. DUTY OF DISCLOSURE

In addition to the duty of disclosure by reason of B/R Energy being the fiduciary of

Simmons, the duty also arises for fraudulent concealment purposes.  While there is a duty to

disclose by those who owe a fiduciary duty, *Shea v. H.S. Pickrell Co., Inc.*, 748 P.2d 980, 982

(N.M. Ct. App. 1987), there may also be a duty to disclose where no fiduciary duty exists.  *See*

*Krupiak v. Payton*, 561 P.2d 1345 (N.M. 1977).  In *Krupiak* the court found that

> Actionable fraud is found if a party to a transaction knows of material facts, has a
> duty to disclose, and remains silent.  A duty to disclose may arise if there is
> knowledge that the other party to a contemplated transaction is acting under a
> mistaken belief.  A duty to disclose may also arise if one has superior knowledge
> that is not within the reach of the other party or could not have been discovered by
> the exercise of reasonable diligence.

*Id.* at 1346 (emphasis added).  B/R Energy falls within either of these two bases imposing

a duty to disclose.  Given that B/R Energy intentionally withheld material information from

Simmons to prevent Simmons from discovering what B/R Energy was taking, such withholding

is a manifestation of B/R Energy's knowledge that Simmons did not know what was happening.

Moreover, the information provided B/R Energy by EPFS provided it with superior knowledge

which B/R Energy prevented Simmons from discovering and which Simmons could not have

discovered with reasonable diligence.  Under this analysis, B/R Energy owed a duty to disclose

this information to D.J. Simmons even if it is not found to be Simmons' fiduciary.

WINSTEAD SECHREST & MINICK P.C.
5400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Telephone: (214) 745-5400
Facsimile: (214) 745-5390

By: _____
        F. Franklin Honea

Richard Gerding
GERDING & O'LOUGHLIN
304 N. Behrend Avenue
Farmington, New Mexico 87401
P.O. Box 1020
Farmington, New Mexico 87499-1020
Telephone: 505/325-1804

**ATTORNEYS FOR PLAINTIFF
D. J. SIMMONS, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded via Certified Mail, Return Receipt Requested to the following on this _1 ⁷_ day of April, 2002:

Sean Downes
Shook & Downes
2727 East 21st Street, Suite 310
Tulsa, OK, 74104-4711

Sealy H. Cavin, Jr.
Stephen D. Ingram
Stratton & Cavin, P.A.
40 First Plaza, Suite 610
Albuquerque, NM 87102

Attorneys for F. Brian Broaddus and B/R Energy Partners, Inc.

F. Franklin Honea