FILED

02 MAY -3 PM 4: 18

D. J. SIMMONS, INC., )
)
     Plaintiff, )
)
v. )    No. CIV 99-1105-JP/LFG
)
F. BRIAN BROADDUS and )
B/REP ENERGY PARTNERS, INC., )
)
     Defendants. )

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND TRIAL BRIEF IN SUPPORT OF CONCLUSIONS OF LAW

COME NOW Defendants F. Brian Broaddus ("Broaddus"), B/R Energy Partners, Inc. ("B/REP") and Phoenix Energy Consulting Services, Inc. ("Phoenix"), and pursuant to the Minute Order dated March 30, 2002 by the Clerk of the Court file their proposed findings of fact and conclusions of law, and trial brief in support of conclusions of law, and moves the Court to adopt the following findings of fact and conclusions of law:

### I.    FINDINGS OF FACT

1.    Plaintiff, D. J. Simmons, Inc., ("Simmons") is a corporation incorporated in the State of Delaware with its principal place of business in Farmington, New Mexico.

2.    B/REPEP was a corporation incorporated under the laws of the State of Texas. B/REPEP filed Articles of Dissolution with the Secretary of State of Texas. B/REP obtained from the Secretary of State of Texas a Certificate of Dissolution on November 23, 1998.

3.    Pursuant to the Texas Business Corporation Act, B/REP's corporate existence survives dissolution for the purpose of defending in its corporate name any action against the corporation.

4.    Broaddus is a resident of the State of Oklahoma. At all relevant times, Broaddus was

the President, sole director and shareholder of B/REP.

5. Broaddus and B/REPEP were served with process through an Acceptance of Service executed by the counsel of record and filed with the District Court Clerk for the County of San Juan, State of New Mexico.

6. B/REP is the alter ego of Broaddus.

7. Broaddus is personally responsible for the acts and omissions of B/REP.

8. Phoenix is an Oklahoma corporation with its principal place of business in Tulsa, Oklahoma. Defendant Phoenix was served with process by letter agreement between Simmons' counsel and Phoenix's counsel.

9. Broaddus is the President, sole director and shareholder of Phoenix.

10. This lawsuit arises from a dispute between Simmons and B/REP regarding the proper payment due Simmons in the form of a "liquid credit" under certain gas purchase and sales agreements for Natural Gas Liquids ("NGLs") after the natural gas production is processed.

11. This Court has removal jurisdiction over this lawsuit under 28 U.S.C. § 1441 because the Plaintiff and the Defendants are citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

12. Venue is proper under 28 U.S.C. § 1391(a)(2) in that a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property at issue is situated, in the District of New Mexico.

13. Commencing December 1, 1995 Simmons sold its natural gas production under written wellhead contracts with B/REP until the expiration of the last contract on December 31, 1998.

14. The natural gas produced from the wellheads of Simmons' wells in San Juan and Rio

-2-

Arriba County, New Mexico was gathered and transported on the El Paso Natural Gas pipeline system.

15. With regard to the El Paso gathering system, there are two processing plants at which natural gas production can be processed. The first is known as the Chaco plant and the second is known at the Blanco plant.

16. The Blanco plant is of the cryogenic processing type.

17. In 1996, El Paso updated the Chaco plant to the cryogenic processing type.

18. In 1995, the Federal Energy Regulatory Commission issued an Order Authorizing Abandonment ("spin-down" order) authorizing the transfer of certain gathering and processing assets to El Paso Field Services, a de-regulated wholly owned subsidiary of El Paso Natural Gas Company.

19. In September 1995, El Paso Field Services presented a Gas Dedication, Gas Gathering, and Production Area Services Agreement to Simmons which would have allowed Simmons to ship its own gas on the El Paso system.

20. By entering into wellhead contracts with B/REP, Simmons elected to minimize its involvement, and the attendant risk, in administering, negotiating and managing its natural gas production.

21. Exhibit D-A is a true and correct copy of the Gas Purchase and Sales Agreement between Simmons and B/REP, dated December 1, 1995 (hereinafter referred to as the "1995 Contract".)

22. With respect to sales under the 1995 Contract, B/REP purchased Simmons' natural gas production at the Simmons' wellheads as referred to on the Exhibit A to the 1995 Contract and acquired title to the natural gas production delivered at the Simmons' wellheads.

23. With respect to the 1995 Contract, B/REP and Simmons expressly recognized that all

-3-

performance under the 1995 contract was made contingent upon transportation agreements with certain third party pipelines and all purchases thereunder were subject to the performance of such third party transporters.

24.    The 1995 Contract provides as follows with respect to the liquid credit: "Seller shall receive liquid credits."

25.    With respect to the 1995 Contract, the quantity of natural gas liquid (NGL) components in determining a liquid credit was to be based upon net gallons attributed by the gas processor.

26.    With respect to the 1995 Contract, the proper calculation for determining the liquid credit is the net gallons of each liquid component extracted from the natural gas processed at the processing plant multiplied by the market value of each liquid component less processing, transportation, fractionation and marketing fees.

27.    B/REP properly paid Simmons for the liquid credits provided for in the 1995 Contract pursuant to the terms of the contract.

28.    With respect to the 1995 Contract, Simmons suffered no injury or damages and is not entitled to a sum of money from B/REP.

29.    Exhibit D-B is a true and correct copy of a Gas Purchase Proposal, dated November 6, 1996, submitted by B/REP to Simmons. Simmons elected "Proposal 2" from the Gas Purchase Proposal.

30.    By electing Proposal 2, Simmons, acting through its representative John Byrom, chose a non-cryogenic accounting methodology. This decision was based upon Simmons' determination that the value for the extracted liquids on a MMBTU basis did not seem to be much better than the value of the MMBTU's if they were left in the tailgate gas and sold at the Inside

-4-

FERC Index.

31.    Simmons' election of Proposal 2 and the statements of John Byrom regarding him seeing no value in enhanced liquid recoveries and wanting to maintain the status quo is a clear expression of Simmons' intentions and understanding that under the 1996 Contract B/REP would remit payment to Simmons under an accounting methodology premised on the processing at the Chaco and Blanco plants prior to the conversion of the Chaco plant to a cryogenic processing facility (i.e. "Old-Chaco").

32.    Exhibit D-C is a true and correct copy of the Gas Purchase and Sales Agreement between Simmons and B/REP, dated December 1, 1996 (hereinafter referred to as the "1996 Contract").

33.    With respect to sales under the 1996 Contract, B/REP purchased Simmons' natural gas production at Simmons' wellheads as referred to on the Exhibit A to the 1996 Contract and acquired title to the natural gas production delivered at Simmons' wellheads.

34.    With respect to the 1996 Contract, B/REP and Simmons expressly recognized that all performance under the 1996 contract was made contingent upon transportation agreements with certain third party pipelines and all purchases thereunder were subject to the performance of such third party transporters.

35.    The 1996 Contract provides as follows with respect to the liquid credit:

> "Buyer shall pay Seller liquid credits attributable to 100% of such production."

36.    With respect to the 1996 Contract, the quantity of natural gas liquid (NGL) components in determining the liquid credit was to be based upon net gallons attributed by the gas processor.

37. With respect to the 1996 Contract, the proper calculation for determining the liquid credit is the net gallons of each liquid component extracted from the natural gas processed at the processing plant multiplied by the market value of each liquid component less processing, transportation, fractionation and marketing fees.

38. B/REP properly paid Simmons for the liquid credits provided for in the 1996 Contract pursuant to the terms of the contract.

39. With respect to the 1996 Contract, Simmons suffered no injury or damages and is not entitled to a sum of money from B/REP.

40. Exhibit D-E is a true and correct copy of the Gas Purchase and Sale Agreement between Simmons and B/REP, dated January 1, 1998 (hereinafter referred to as the "1998 Contract".)

41. With respect to sales under the 1998 Contract, B/REP purchased Simmons' natural gas production at the Simmons' wellheads as referred to on the Exhibit A to the 1998 Contract and acquired title to the natural gas production delivered at Simmons' wellheads.

42. With respect to the 1998 Contract, B/REP and Simmons expressly recognized that all performance under the 1998 contract was made contingent upon transportation agreements with certain third party pipelines and all purchases thereunder were subject to the performance of such third party transporters.

43. The 1998 Contract provides as follows with respect to the liquid credit:

> "Buyer shall pay Seller liquid credits for NGL gallons attributable to Buyer's GPAS agreement based on OPIS Mt. Belvieu averages, less any processing, transportation, fractionation, and marketing fees assessed."

44. With respect to the 1998 Contract, the quantity of natural gas liquid (NGL)

components in determining a liquid credit was to be based upon net gallons attributed by the gas processor.

45.     With respect to the 1998 Contract, the proper calculation for determining the liquid credit is the net gallons of each liquid component extracted from the natural gas processed at the processing plant multiplied by the market value of each liquid component less processing, transportation, fractionation and a marketing fee.

46.     B/REP properly paid Simmons for the liquid credits provided for in the 1998 Contract pursuant to the terms of the contract.

47.     With respect to the 1998 Contract, Simmons suffered no injury or damages and is not entitled to a sum of money from B/REP.

48.     The term "liquid credit" is not a term with a standard accepted definition in the natural gas industry.

49.     During the 1995 Contract Simmons knew that 39% of the natural gas liquids extracted at the Blanco facility were retained by the gas processor for that part of the natural gas production purchased from Simmons deemed processed at the Blanco facility.

50.     During the 1996 Contract Simmons knew that 39% of the natural gas liquids extracted at the Blanco facility were retained by the gas processor for that part of the natural gas production purchased from Simmons deemed processed at the Blanco facility.

51.     During the 1995 Contract, B/REP charged Simmons a processing fee on only those inlet MMBTUs deemed processed at the Chaco plant.

52.     During the 1996 Contract, B/REP charged Simmons a processing fee on only those inlet MMBTUs deemed processed at the Chaco plant.

53.     With respect to Simmons' sale of natural gas prior to the 1995 Contract, Simmons understood that the proper calculation for determining the liquid credit is the net gallons of each liquid component extracted from the natural gas processed at the processing plant multiplied by the market value of each liquid component less processing, transportation, fractionation and marketing fees.

54.     With respect to the 1995 Contract, Simmons had actual knowledge of information regarding its natural gas production sold to B/REP which included: (1) natural gas liquid (NGL) shrinkage percentages reflecting recovery of ethane and propane at Conoco's Blanco Plant; (2) adjustments to scheduled volumes; and (3) Default Agreements.

55.     With respect to the 1996 Contract, Simmons had actual knowledge of information regarding its natural gas production sold to B/REP which included: (1) natural gas liquid (NGL) shrinkage percentages reflecting recovery of ethane and propane at Conoco's Blanco Plant; (2) the start up of the New Chaco Cryogenic plant; (3) negotiated product extraction rates; (4) adjustments to scheduled volumes; (5) GPAS contracts with applicable publicly posted rates; and (6) Default Agreements.

56.     With respect to the 1998 Contract, Simmons had actual knowledge of information regarding its natural gas production sold to B/REP which included: (1) natural gas liquid (NGL) shrinkage percentages reflecting recovery of ethane and propane at Conoco's Blanco Plant; (2) the start up of the New Chaco Cryogenic plant; (3) negotiated product extraction rates; (4) adjustments to scheduled volumes; (5) GPAS contracts with applicable publicly posted rates; and (6) Default Agreements.

57.     With respect to the 1995 Contract, Simmons received monthly reports generated by El Paso Field Services which contained the following information: (1) volume allocation data; (2)

-8-

meter shrinkage data; (3) estimated meter shrinkage; and (4) natural gas liquid (NGL) shrink data, for gas producing properties in which D.J. Simmons, Inc. had an operating or non-operating interest

58.    With respect to the 1996 Contract, Simmons received monthly reports generated by El Paso Field Services which contained the following information: (1) volume allocation data; (2) meter shrinkage data; (3) estimated meter shrinkage; and (4) natural gas liquid (NGL) shrink data, for gas producing properties in which D.J. Simmons, Inc. had an operating or non-operating interest

59.    With respect to the 1998 Contract, Simmons received monthly reports generated by El Paso Field Services which contained the following information: (1) volume allocation data; (2) meter shrinkage data; (3) estimated meter shrinkage; and (4) natural gas liquid (NGL) shrink data, for gas producing properties in which D.J. Simmons, Inc. had an operating or non-operating interest

60.    During the 1995, 1996 and 1998 Contracts, Simmons had a written agreement with El Paso Field Services governing electronic transmission and receipt of natural gas production data which included among other things, the following: (1) Upstream/Downstream Contracts; (2) Dedication Agreements; (3) Monthly Gas Volume Statements; (4) Wellhead Volume Statements; (5) Accounting Reports; (6) Liquid Credit Details Statements; (7) Transportation Invoices; (8) Meter Charges Detail; and (9) Non-Meter Charges.

61.    With respect to Simmons' sale of natural gas production since the 1998 Contract, the quantity of natural gas liquid (NGL) components in determining the liquid credit has been based upon net gallons attributed by the gas processor.

62.    B/REP did not breach the duty of good faith and fair dealing implied in the 1995 Contract.

63.    B/REP did not breach the duty of good faith and fair dealing implied in the 1996 Contract.

64.     B/REP did not breach the duty of good faith and fair dealing implied in the 1998 Contract.

65.     B/REP did not act as a fiduciary to Simons and owed no fiduciary duties to Simmons under the 1995 Contract.

66.     B/REP did not act as a fiduciary to Simons and owed no fiduciary duties to Simmons under the 1996 Contract.

67.     B/REP did not act as a fiduciary to Simons and owed no fiduciary duties to Simmons under the 1998 Contract.

68.     B/REP made no false representations or promises to Simmons in the negotiation of the 1995 Contract.

69.     B/REP made no false representations or promises to Simmons in the negotiation of the 1996 Contract.

70.     B/REP made no false representations or promises to Simmons in the negotiation of the 1998 Contract.

71.     B/REP made no false representations in remitting payment to Simmons under the 1995 Contract.

72.     B/REP made no false representations in remitting payment to Simmons under the 1996 Contract.

73.     B/REP made no false representations in remitting payment to Simmons under the 1998 Contract.

74.     Simmons and B/REP did not labor under any mutual mistakes under the 1995 Contract.

75. Simmons and B/REP did not labor under any mutual mistakes under the 1996 Contract.

76. Simmons and B/REP did not labor under any mutual mistakes under the 1998 Contract.

77. B/REP did not exert wrongful acts of dominion over the natural gas liquids, or their proceeds, in a manner inconsistent with Simmons' rights under the 1995 Contract.

78. B/REP did not exert wrongful acts of dominion over the natural gas liquids, or their proceeds, in a manner inconsistent with Simmons' rights under the 1996 Contract.

79. B/REP did not exert wrongful acts of dominion over the natural gas liquids, or their proceeds, in a manner inconsistent with Simmons' rights under the 1998 Contract.

80. B/REP's payment to Simmons for liquid credits under the 1995 Contract is consistent with the conditions under which Simmons agreed to sell natural gas to B/REP and does not constitute a conversion.

81. B/REP's payment to Simmons for liquid credits under the 1996 Contract is consistent with the conditions under which Simmons agreed to sell natural gas to B/REP and does not constitute a conversion.

82. B/REP's payment to Simmons for liquid credits under the 1998 Contract is consistent with the conditions under which Simmons agreed to sell natural gas to B/REP and does not constitute a conversion.

83. The natural gas liquids (NGLs) extracted and recovered from the natural gas stream under the 1995, 1996 and 1998 Contracts are not personal property interests of Simmons.

84. Simmons failed to exercise reasonable care in the negotiation and administration of the 1995 Contract.

85. Simmons failed to exercise reasonable care in the negotiation and administration of the 1996 Contract.

86. Simmons failed to exercise reasonable care in the negotiation and administration of the 1998 Contract.

87. The three cent ($.03) marketing fee assessed by B/REP under the 1995, 1996 and 1998 contract was reasonable.

88. The course of dealing between B/REP and Simmons estops Simmons from claiming damages against B/REP.

89. The course of performance between B/REP and Simmons estops Simmons from claiming damages against B/REP.

90. The course of dealing between B/REP and Simmons waives Simmons' causes of action and claims against B/REP.

91. The course of performance between B/REP and Simmons waives Simmons' causes of action and claims against B/REP.

## II.    CONCLUSIONS OF LAW

1. Extrinsic evidence of usage of trade, course of dealing, course of performance and consistent additional terms is admissible in construing the 1995, 1996 and 1998 Gas Contracts.

2. Evidence extrinsic to the terms of the 1995, 1996 and 1998 Gas Contracts is also admissible relative to the issues of fraud and mistake raised by Simmons in connection with the execution of the Contracts.

3. B/REP complied with its obligations under the 1995 Gas Contract, B/REP properly paid Simmons for all sums due Simmons under the 1995 Gas Contract, and B/REP did not breach the 1995 Gas Contract.

4. B/REP complied with its obligations under the 1996 Gas Contract, B/REP properly paid Simmons for all sums due Simmons under the 1996 Gas Contract, and B/REP did not breach the 1996 Gas Contract.

5. B/REP complied with its obligations under the 1998 Gas Contract, B/REP properly paid Simmons for all sums due Simmons under the 1998 Gas Contract, and B/REP did not breach the 1998 Gas Contract.

6. Simmons is barred from recovery under the doctrine of estoppel.

7. Simmons is barred from recovery under the doctrine of waiver.

8. B/REP discharged any duty of good faith and fair dealing it owed Simmons under the 1995, 1996 and 1998 Gas Contracts.

9. There was no special or confidential relationship between Simmons and B/REP so as to support Simmons' claim that B/REP owed a fiduciary duty to Simmons.

10. Neither Simmons nor B/REP made a mistake as to any basic assumption as to the terms of the 1995, 1996 and 1998 Gas Contracts, therefore Simmons may not avoid the effect of such contracts on the basis of mutual mistake.

11. Simmons was negligent as it did not exercise reasonable care in negotiating and administering the 1995, 1996 and 1998 Gas Contracts.

12. B/REP made no representations of material fact to Simmons outside the promises made in the 1995, 1996 and 1998 Gas Contracts so as to support Simmons' fraud cause of action against B/REP.

13. Simmons did not reasonably rely on any representation of material fact by B/REP so as to support Simmons' fraud cause of action against B/REP.

14. B/REP had no duty to disclose to Simmons in the performance of the 1995, 1996 and

1998 Gas Contracts.

15.     Simmons' action is for money damages, and not for recovery of any specifically identifiable fund or personal property, therefore Simmons may not maintain a conversion cause of action against B/REP.

16.     The damages that Simmons seeks in this case are damages due to economic loss alleged to have been caused by B/REP's breach of contract, therefore, Simmons may not recover under its tort causes of action for breach of fiduciary duty, fraud, breach of duty of good faith and fair dealing, or conversion.

17.     There is no evidence of a culpable mental state by B/REP to support an award of punitive damages on any of Simmons' contract or tort causes of action.

18.     Judgment should be entered that Simmons take nothing on its breach of contract cause of action against B/REP.

19.     Judgment should be entered that Simmons take nothing on its breach of fiduciary duty cause of action against B/REP.

20.     Judgment should be entered that Simmons take nothing on its fraud cause of action against B/REP.

21.     Judgment should be entered that Simmons take nothing on its breach of duty of good faith and fair dealing cause of action against B/REP.

22.     Judgment should be entered that Simmons take nothing on its conversion cause of action against B/REP.

23.     Judgment should be entered that Simmons take nothing on its mistake cause of action against B/REP.

24.     Alternatively, to the extent Simmons can prove entitlement to any damages, B/REP is

entitled to an offset in the amount of $_____.

25.    Judgment should be entered that Simmons take nothing on its claims against F. Brian Broaddus for individual liability for the acts of B/REP, because Simmons is entitled to no recovery against B/REP.

26.    Judgment should be entered that Simmons take nothing against Phoenix Energy Consulting Services, Inc. on Simmons' claims for successor liability and fraudulent transfer, as Simmons is entitled to no recovery against B/REP.

27.    Simmons is not entitled to the recovery of attorneys' fees, as there is no statute, contract or court rule authorizing the recovery of attorneys' fees in this case.

28.    Defendants are entitled to recovery of their costs.

## III.    TRIAL BRIEF IN SUPPORT OF CONCLUSIONS OF LAW

### A.    CONTRACT CONSTRUCTION

The rules of contract construction in New Mexico bar the relief Simmons seeks in this case. As discussed below, the doctrines of usage of trade, course of dealing, course of performance, and other consistent additional terms all demonstrate that Simmons received the bargain that it struck with B/REP in the subject Gas Contracts. The Exhibit D – G March 1, 1995 Gas Purchase and Sales Agreement between Simmons and Cook Inlet contains the exact same contractual provision with respect to liquid credits as one of Simmons' Gas Contracts with B/REP at issue in this case. It is anticipated that Simmons will attempt to introduce evidence of the meaning of "liquid credits" which is inconsistent with the usage employed by it with regard to the Cook Inlet contract. Exhibit D – G is therefore probative of usage of trade, constitutes competent extrinsic evidence which will tend to explain the term liquid credits, and is evidence of Simmons' knowledge and intent in entering into the Gas Contracts with B/REP. The  Exhibit D – R December 1, 1998 Natural Gas Purchase

Agreement between Simmons and Wasatch Energy demonstrates that the term "liquid credits" as used therein is consistent with the manner in which it was used between B/REP and Simmons, and is thus probative of usage of trade and is competent extrinsic evidence explaining the terms used in the subject contracts. The same holds true for Exhibits D – S and D – Z, which are a January 1, 2000 Gas Dedication Agreement between Simmons and El Paso Field Services and a Natural Gas Purchase Agreement between Simmons and Snyder Gas Marketing, Inc., respectively. Both demonstrate that B/REP's method of payment to Simmons with regard to "liquid credits" owed Simmons is entirely consistent with usage within the industry and the usage employed by Simmons with regard to other purchasers. Other documents extrinsic to the Gas Contracts themselves are admissible to show the proper construction of the 1995, 1996 and 1998 Gas Contracts between Simmons, and demonstrate that B/REP has complied with all of its contractual obligations to Simmons.

New Mexico does not follow the "four corners" rule of contract construction. In New Mexico, "in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of a contract and any relevant usage of trade, course of dealing and course of performance." *C. R. Anthony Co. v. Loretto Mall Partners,* 112 N.M. 504, 508-09, 817 P.2d 238, 242-45 (1991). "It is invariably necessary, before a court can give any meaning to the words of a contract . . . that extrinsic evidence shall be heard to make the court aware of the 'surrounding circumstances' including the persons, objects, and events to which the words can be applied and which caused the words to be used." *Id.* at 508, citing 3 Corbin, Contracts, 536. The New Mexico Supreme Court in *C. R. Anthony* concluded that "where conflicting inferences could be drawn from the evidence regarding the parties' intent, such differences ought to be resolved by the fact finder after a full evidentiary hearing." *Id.* at 512. The

concepts of contract construction adopted by the New Mexico Supreme Court apply to Uniform Commercial Code-controlled contracts by way of NMSA 1978, § 55-1-103:

> Unless displaced by the particular provisions of the act [this chapter], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy or other validating or invalidating cause shall supplement its provisions.

NMSA 1978, § 55-1-103. A contract for the sale of natural gas is a contract for the sale of goods governed by the UCC. NMSA 1978, § 55-2-107. A contract under the UCC is to be construed in accordance with prior course of dealing between the parties to a particular transaction (NMSA 1978, §§ 55-1-205, 55-2-202), prior course of performance between the parties (NMSA 1978, §§ 55-2-202, 55-2-208), usage of trade in the industry (NMSA 1978, §§ 55-1-205, 55-2-202), and may be explained or supplemented by evidence of consistent additional terms (NMSA 1978, § 55-2-202(b)).

The threshold determination of "intent of the parties" is critical to understanding the meaning of the parties, and thus relevant extrinsic evidence on this point is not barred by the parol evidence rule and is fully embraced in the liberal interpretation allowed by the UCC. Contrary to Simmons' contentions, the UCC actually permits additional evidence not contemplated in other types of contracts and permits admission of evidence that it could arguably be excluded under New Mexico's common law formulation of the parol evidence rule. Accordingly, Simmons' reliance on the UCC is a basis for excluding extrinsic evidence which will explain the meaning of the term "liquid credits" and the parties' expectations as to the amounts to be paid under the 1995, 1996 and 1998 Gas Contracts is misplaced. The UCC, in fact, *expands* on the New Mexico common law conception of the parol evidence rule and provides a basis for admissibility of the very types of evidence offered by Defendants as to the parties' course of dealing, course of performance and usage of trade as well as

-17-

additional consistent terms that Simmons seeks to have excluded.

The New Mexico adoption of the UCC incorporates the concepts that the agreement may not include all the terms upon which the parties agreed and this issue must be explored by the Court by permitting introduction of applicable relevant extrinsic evidence to prove "other" matters agreed upon. NMSA 1978, § 55-202, Official Comment No. 1(a). Of necessity, meanings which arise out of the commercial context of words and terms of the agreement must also be explored using the document as well as applicable relevant extrinsic evidence. *Id.* at 1(b). Finally, there is no requirement that the contract language be ambiguous before extrinsic evidence can be used to explain or supplement the terms of the agreement, even with the existence of a merger clause. *Id.* In this case, there is no merger or integration clause contained in the 1995, 1996 or 1998 Gas Contracts. Even if there was, this would not bar introduction of such evidence.

"Course of dealing," "usage of trade," and "course of performance," evidence is admissible to explain or supplement the terms of any writing. NMSA 1978, § 55-2-202, Official Comment No. 2. Course of prior dealings and usages of trade are "taken for granted when the document was phrased" and become "an element of the meaning of the words used" unless they have been "carefully negated." *Id.* Course of actual performance by the parties regarding the contract at issue "is considered the best indication of what they intended the writing to mean." *Id.* Clearly, then, extrinsic evidence of course of dealing and trade usage are literally part of the contract and must be admissible evidence to adduce its meaning unless the party standing on the four corners of the document can show which evidence was explicitly and specifically *not* a part of the contract. Simmons can make no such demonstration. "Usage of trade" evidence is admissible to add, subtract or qualify the terms of an agreement or explain their meaning, *even if* contradictory to the words contained therein. *State ex rel. Nichols v. Safeco Insurance Co. of America,* 100 N.M. 440, 444, 671

-18-

P.2d 1151, 1155 (Ct. App. 1983). "Parties to a contract are presumed to know a well-defined trade usage generally adopted by those engaged in the business to which the contract relates." *Wolfe v. Texas Co.,* 83 F.2d 425 (10th Cir. 1936).

Finally, Official Comment No. 3 to § 55-202 provides that "consistent additional terms, not reduced to writing, may be proved unless the court finds that the writing was intended by both parties as a complete and exclusive statement of all the terms." *Id.* Again, the party who contends the writing was intended as a complete and exclusive statement by both parties, in this case Simmons, has the burden of demonstrating this point and showing the careful negation of applicable trade usage and course of dealing evidence. No such negation is made in these contracts.

Simmons also ignores that fact that extrinsic evidence is always admissible under principles of law and equity relative to questions of "fraud, misrepresentation, duress, coercion, and mistake." NMSA 1978, § 55-1-103. Such evidence is relevant and admissible to *defend* against fraud and mistake as well.

Accordingly, the UCC presumes, unless proven otherwise, that a writing does not include all of the terms of the parties' agreement. The party standing on the writing must prove that the document is the exclusive and complete agreement of the parties by demonstrating explicit contract terms that carefully negate the material that the UCC otherwise presumes is part of every agreement, i.e., course of dealing, course of performance or usage in the trade. In this connection, the Court should hear all relevant extrinsic evidence to determine of the agreement is so exclusive and complete that it performs this extraordinary task of excluding all such extrinsic evidence. However, in no event is evidence to prove or defend against fraud or mistake barred by the parol evidence rule at common law or under the UCC. Giving due consideration to such competent evidence in construing the Gas Contracts, the Court should conclude that B/REP in fact complied with its

-19-

contractual obligations.

## B. WAIVER AND ESTOPPEL

B/REP contends that by virtue of the ample data available to Simmons that would have informed it, to the extent it was not already so informed, of the gallons made available to B/REP by El Paso Field Services on which B/REP was paying Simmons under the Gas Contracts, and also due to Simmons' knowledge from its dealings with other gas purchasers of its receipt of payments for "liquid credits" consistent with that which it received from B/REP, Simmons has waived and/or is estopped from claiming a breach by B/REP of its duties to Simmons.

The elements of an equitable estoppel defense are: 1) knowing misrepresentation or concealment of a material fact; 2) made by the party to be estopped with the intention or expectation that the other party will act thereon; and 3) detrimental reliance without knowledge of the true facts by the party asserting estoppel. *Mayfield Smithson Enterprises v. ComQuip, Inc.,* 120 N.M. 9, 12, 896 P.2d 1156, 1159 (1995). Here, B/REP relied to its detriment on the fact that its method of payments to Simmons under the terms of their Gas Contracts was in accordance with Simmons' understanding and belief as to the proper method to pay Simmons for "liquid credits." As the evidence at trial will show, Simmons did not complain of B/REP's payments to Simmons until Joe Slaton, a disgruntled ex-B/REP consultant, went to Simmons and attempted to extract money from Simmons in exchange for information provided to Simmons to fabricate a basis for alleged recovery by Simmons against B/REP, in which Slaton would participate. The contracts were fully performed by such time and B/REP was never put on notice prior to such time by Simmons that it did not believe that B/REP was performing under the contracts as agreed.

Waiver requires relinquishment of a known legal right for consideration where such legal right is intended for the waivor's sole benefit and does not infringe on the rights of others. *McCurry*

*v. McCurry,* 117 N.M. 564, 567, 874 P.2d 25, 28 (Ct. App. 1994). Here, Simmons waived its rights to complain of B/REP's payments by accepting payment from B/REP under the 1995, 1996 and 1998 Gas Contracts without complaint and without notice to B/REP that Simmons believed such payments were insufficient and in violation of the contract terms. For example, in *Clovis National Bank v. Thomas,* 77 N.M. 554, 425 P.2d 726 (1967), a bank was held to have waived its right to complain, in a conversion action, of the sale by an auction house of cattle when it acquiesced in the sale of cattle covered by its security agreement. *Id.* at 563.

### C. MISTAKE

Simmons alternatively claims that if B/REP did not know that it was paying Simmons for liquid credits based on net gallons, and not gross gallons, received from El Paso Field Services, the subject contracts should be reformed due to mutual mistake. A mutual mistake occurs where the minds of the parties have not met on any part of a proposed contract. *Jacobs v. Phillippi,* 102 N.M. 449, 451-52, 697 P.2d 132, 143-45 (1985). The contract must be different from what *each* party intended for there to be a mutual mistake that would constitute voiding the effect of the contract. *Id.* The contracts at issue were not different from what *B/REP* intended, therefore is no mutual mistake.

As concerns the 1995 Gas Contract, B/REP as well as Simmons knew that the Blanco Plant was taking a liquid retention instead of a processing fee, and that the Chaco Plant was not taking such a liquid retention. As concerns the 1996 Gas Contract, the Chaco Plant's new capability to make enhanced liquid recoveries was known to both parties. What Simmons knew or should have known, had it exercised reasonable diligence, was that its election to receive payments based on an accounting methodology premised on the Chaco Plant's pre-cryogenic capabilities required B/REP to ratio back gallons on which it paid Simmons. As concerns the 1998 Gas Contract, B/REP paid Simmons based on what El Paso Field Services reported as available gallons. The terms of the

-21-

contract provided that B/REP only received the gallons that El Paso Field Services reported, whether they be net gallons or gross gallons, and B/REP was thereupon obligated only to pay Simmons for the gallons that it sold. Whether it knew that such gallons were net or gross is irrelevant; it was not a material contract term, and forms no basis for a claim of mutual mistake.

Simmons can also not attempt to avoid the contracts based on *unilateral* mistake. The elements of a claim for unilateral mistake are a mistake by a party not bearing the risk of such mistake as to a basic assumption on which it made a contract, that has a material effect on the exchange of performance, and the effect of the mistake is that enforcement of the contract would be unconscionable, or the other party has reason to know of the mistake. *National Rural Utilities Co-Op Finance Corp. v. United* States, 14 Cl. Ct. 130, 141 (Cl. Ct. 1998). Simmons bore the risk of its mistake. A party bears the risk of its mistake if it is aware that it has only limited knowledge at the time it makes a contract but treats his limited knowledge as *sufficient. CPL (Delaware) LLC v. Conley*, 40 P.3d 679, 682 (Wash. App. 2002). In *Albuquerque National Bank v. Albuquerque Ranch Estates, Inc.*, 99 N.M. 95, 654 P.2d 548 (1982), the court held that a party who was negligent in failing to exercise reasonable diligence in ascertaining the true facts concerning a real estate contract was not entitled to equitable relief for its mistake of fact. *Id.* at 102. As the evidence will show, John Byrom of Simmons and before him Bill Manchester represented to B/REP that they had sufficient knowledge of the terms of natural gas marketing agreements to allow them to contract on an informed basis even though they did not in fact possess sufficient knowledge. They therefore bore the risk of any mistake by them as to the meaning of the price terms they negotiated on behalf of Simmons, and are entitled to no relief based on mistake.

### D.     DUTY OF GOOD FAITH AND FAIR DEALING

NMSA 1978, § 55-1-203 imposes a duty of good faith in the performance and enforcement of

contractual obligations governed by the UCC. It does not give rise to a duty by B/REP over and above its duty to perform its contractual obligations in good faith. B/REP's duty of good faith and fair dealing was discharged.

## E. BREACH OF FIDUCIARY DUTY

Simmons claims that B/REP was charged with the obligations of a fiduciary under the 1995, 1996 and 1998 Gas Contracts in holding funds due Simmons in connections with the liquid credits due thereunder. However, Simmons admits these were wellhead contracts in which B/REP took title to the natural gas purchased from Simmons. B/REP did not agree to act as trustee for Simmons or to hold property or funds on Simmons' behalf. B/REP dealt with subsequent buyers downstream on its own behalf. B/REP did not obligate itself to Simmons other than as a contracting party. Most business relationships do not create fiduciary obligations. *Gutfreund v. Christoph*, 658 F. Supp. 1378, 1395 (N.D. Ill. 1987). A fiduciary relationship exists in cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing the confidence. *Moody v. Stribling*, 1999-NMCA-094, 127 N.M. 630, 636 (Ct. App. 1999). However, mere subjective trust is not enough to transform arm's-length dealing into fiduciary relationships. *Blue Bell v. Peat, Marwick, Mitchell & Co.*, 715 S.W.2d 408, 416 (Tex. App. – Dallas 1986, *writ ref'd n.r.e*). The imposition of a fiduciary duty presupposes an imbalance between the parties' interest. *See, i.e., Imperial Premium Finance, Inc. v. Khoury*, 129 F.3d 347, 353 (5th Cir. 1997) (under Texas law, fiduciary duty will not be lightly created since it requires the fiduciary to put the interests of the beneficiary *ahead* of its own if the need arises); *Teachers Insurance and Annuity Association of America v. Wometco Enterprises, Inc.*, 833 F. Supp. 344, 349-50 (S.D.N.Y. 1993) (under New York law, fiduciary duty exists if one assumes *control* and responsibility over another); *Kueffer v. Kueffer*, 110 N.M. 10, 13, 791 P.2d 461, 464

(1990) (under New Mexico law, fiduciary is obligated to act *primarily* for another's benefit in matters connected with such undertaking). Certainly Simmons does not contend that B/REP controlled it or that B/REP was under an obligation to act primarily for Simmons' benefit. Absent that, no fiduciary relationship was created, and Simmons cannot recover on its breach of fiduciary duty claim.

## F. FRAUD

To prevail on its fraud cause of action, Simmons must prove: 1) A representation of fact by B/REP which was not true; 2) B/REP knew of its falsity or made the representation recklessly; 3) the representation was made with intent to induce reliance; and 4) Simmons relied on the representation to its detriment. *See, Eckhardt v. Charter Hospital of Albuquerque, Inc.,* 1998-NMCA-017, 124 N.M. 549, 562. These elements must be proved by *clear and convincing evidence. Id.* Simmons cannot recover under a fraud theory from B/REP. First, B/REP had no "duty to disclose" as Simmons contends. Second, Simmons did not reasonably rely on any representations of B/REP. Third, Simmons does not seek to recover based on promises not contained in the subject contracts, and its claimed damages only arise from the contracts.

A duty to disclose in order to support a fraud claim arises where: 1) there is a previous definite *fiduciary* relationship; 2) a party expressly reposes a trust or confidence in the other; or (3) where the contract or transaction is intrinsically fiduciary and calls for perfect good faith. *R. A. Peck, Inc. v. Liberty Federal Savings Bank,* 108 N.M. 84, 89, 766 P.2d 928, 933 (Ct. App. 1988). As discussed above, there was no fiduciary or confidential relationship. The parties negotiated at arm's-length. The contracts they negotiated simply provide for the purchase by B/REP of Simmons' gas on the terms set forth therein. A duty to disclose as may support fraud may arise if there is knowledge that the other party to a contemplated transaction is acting under a mistaken belief or if

-24-

one has superior knowledge that is not within the reach of the other party or *could not have been discovered by the exercise of reasonable diligence. Krupiak v. Payton,* 90 N.M. 252, 253, 561 P.2d 1345, 1346 (1977). Here, Simmons had access to sufficient data that it could have obtained in the exercise of reasonable diligence that would have disclosed information concerning the method by which B/REP was paying Simmons. The fact that Simmons did not exercise reasonable care in availing itself of such data does not provide it a basis for suing B/REP for not disclosing such information to it.

Simmons is also unable to maintain its fraud cause of action because the nature of its claim is really contractual and not in tort. Generally, the failure to perform the terms of a contract is a breach of contract, not a tort. *Crim Truck & Tractor Co. v. Navistar International Transportation Corp.,* 823 S.W.2d 591, 597 (Tex. 1992). Simmons is primarily seeking benefit of the bargain damages. Where a party is seeking to recover what he would have gained had the promise been performed, the action is one for breach of contract. *Barbouti v. Munden,* 866 S.W.2d 288, 294 (Tex. App. – Houston [14th Dist.] 1993, *writ denied*). A party's failure to perform a contract, standing alone, is no evidence of that parties' intent not to perform at the time the contract was made so as to support fraud. *Crim,* 823 S.W.2d at 597; *Barbouti,* 866 S.W.2d at 295-96.

Simmons also did not reasonably rely on any representations of B/REP. B/REP incorporates its arguments and authorities above as to mistake in this regard.

Further, the economic loss rule bars Simmons' recovery in tort. In commercial transactions, when there is no great disparity in bargaining power, economic losses from injury of a product to itself are not recoverable in tort actions; damages for such economic losses in commercial settings in New Mexico may only be recovered in contract actions. *In re Consolidated Vista Hills Retaining Wall Litigation,* 119 N.M. 542, 550, 893 P.2d 438, 446 (1995). The purpose of this rule is to further

-25-

the policy of not allowing tort law to alter or avoid a bargain struck in a contract – the law of contract provides an adequate remedy. *Id.* The rule does not bar recovery of economic loss damages; rather, the rule only bars recovery of such damages in *tort*. *Id.* at 551.

## G. CONVERSION

Simmons has no claim for conversion. This is because Simmons admits that the contracts at issue were *wellhead* contracts: the significance being that B/REP took *title* to the gas purchased at the wellhead and was not to hold or return in kind any such gas. Simmons is attempting to manufacture a larger damage model by contending that by "failing to account for 40% of the liquid component of the gas stream once processed," it converted those liquids. Again, Simmons did not *own* this gas – it sold *all* of the gas, including its liquid components to be extracted therefrom, to B/REP at the wellhead. It was not a consignment sale; no trust was created; it was an arm's-length sale of a product from a seller to a buyer, nothing more.

Simmons' claim is for monies allegedly not paid by B/REP to Simmons under the Gas Contracts attributable to liquids extracted by the processing plants from the gas that B/REP purchased. This is merely a claim for money damages; it is *not* a claim for recovery of the market value of identifiable personal property owned by Simmons and converted by B/REP. Conversion is the wrongful exercise of dominion over *chattel* to the exclusion or in defiance of the owner's rights thereto. *Taylor v. McBee*, 78 N.M. 503, 506, 433 P.2d 88, 91 (Ct. App. 1967). An action for conversion will lie when the item allegedly converted is *personal property*. *Nosker v. Trinity Land Co.,* 107 N.M. 333, 338, 757 P.2d 803, 808 (Ct. App. 1988). The fact that the subject of conversion must be property, and not money, is confirmed by the fact that the measure of damages for conversion is the value of the *property* at the time of the conversion, plus interest. *Security Pacific Financial Services v. Signfilled Corp.,* 1998-NMCA-046, 125 N.M. 38, 43. Money's value is its

face value regardless of the time and place of the conversion. The real purpose of Simmons' claim is belied by its contention on page 57 of its trial brief that "B/REP Energy Partners, Inc. acted as a fiduciary to Simmons in holding **funds** due Simmons in connection with the liquid credits. . ." (emphasis added). B/REP could not have been holding *funds* due Simmons attributable to liquid credits and at the same time be holding *property* due Simmons in the form of the liquids themselves.

Generally, money is not subject to a civil action for conversion. *Taylor v. Powertel, Inc.,* 551 S.E.2d 765, 769 (Ga. App. 2001); *Johnson v. Studholme,* 619 F. Supp. 1347 (D. Colo. 1985); *Citipostal, Inc. v. Unistar Leasing,* 724 N.Y.S.2d 555, 559 (2001). The only exception to this rule is when money is identified as a specific chattel, and not where the debt may be discharged by the payment of money generally. *See, Estate of Townes v. Townes,* 867 S.W.2d 414, 419-20 (Tex. App.-Houston [14th Dist.] 1993, *writ denied*). Also, commercial paper can support a conversion cause of action where it is identified as a specific chattel. *Dwyer v. Unit Power, Inc.,* 965 S.W.2d 301, 305-06 (Mo. App. 1998). Neither situations are present in the case at bar. Simmons' contentions only support a breach of contract claim, if any. There is no proper conversion claim in this case.

Even if Simmons could somehow make out a conversion claim in this case, it seeks the wrong measure of damages. Again, the measure of damages in New Mexico for conversion is the value of the property at the time of conversion, with interest. *Martinez v. Vigil,* 19 N.M. 306, 307, 142 P. 920, 921 (1914). Simmons cites the case of *Goessling v. Gross, Kelly & Co.,* 113 P. 608 (N.M. 1910) for the proposition that when the market value of the subject property is of a fluctuating nature, the plaintiff is entitled to the highest market value between the time of conversion and the time of trial. *Goessling* is distinguishable because it was a *consignment* case in which the value of the consigned wool held by the consignee was subject to fluctuating market conditions. Here, B/REP bore the risk of fluctuating market conditions by buying Simmons' gas at the wellhead. Not

York conversion law limited to value of property at time and place of conversion plus interest; lost profits generally disallowed because fixed legal interest rate replaces uncertain and indefinite profits that plaintiff might have made either from possession of goods or their equivalent in money). In the event Simmons is able to prove a factual and legal basis for its conversion claim, its damages are limited to the value of the liquids allegedly converted at the time and place of their conversion, plus interest, and no more. To allow any further recovery of damages by Simmons would be to grant a windfall to Simmons to which it is not entitled.

## H. ACTUAL DAMAGES

In the event Simmons can show any basis for recovery of damages, it is not entitled to a duplicate recovery. *See, Hale v. Basin Motor Co.,* 110 N.M. 314, 320, 795 P.2d 1006, 1012 (1990) (New Mexico does not allow duplication of damages or double recovery for injuries received). The prevailing party must elect between damage awards that have duplicative elements of damages. *Id.* A party recovering under a breach of contract claim is entitled to just compensation for loss or damage actually sustained, but should be awarded neither less nor more than his actual damages. *Stewart v. Basey* 245 S.W.2d 484, 486 (Tex. 1952); *Paiz v. State Farm Fire and Casualty Co.,* 118 N.M. 203, 212, 880 P.2d 300, 309 (regardless of character of breach, injured party should not be put in better position than had the contract been performed). Damages for breach of contract must be a natural and foreseeable consequence of the breach as contemplated by the parties at the time of making the contract. *State Farm General Insurance Co. v. Clifton,* 86 N.M. 757, 527 P.2d 798 (1974). The amount of damages allowed must be subject to reasonable ascertainment and not based on speculation or guesswork. *Louis Lyster, General Contractor v. Town of Las Vegas,* 75 N.M. 427, 405 P.2d 665 (1965).

## I. PUNITIVE DAMAGES

In a breach of contract case, punitive damages are allowable upon "a showing of bad faith, or at least a showing that the breaching party acted with reckless disregard for the interests of the nonbreaching party." *Paiz v. State Farm Fire and Casualty Co.,* 118 N.M. 203, 210, 880 P.2d 300, 307 (1994). A punitive damages award in any case must be premised on "some evidence of a culpable mental state." *Construction Contracting and Management, Inc. v. McConnell,* 112 N.M. 371, 375, 815 P.2d 1161, 1165 (1991). Such a culpable mental state exists when a defendant acts with "reckless disregard" for the rights of the plaintiff, i.e., when the defendant knows of potential harm to the interests of the plaintiff but nonetheless literally fails to exercise care to avoid such harm. *Paiz,* 118 N.M. at 211. There must be evidence of culpable conduct beyond that necessary to establish the underlying cause of action to support punitive damages recovery. *Jones v. Lee,* 1999-NMCA-008, 126 N.M. 467. The evidence at trial will show no such culpable mental state by B/REP and no basis for punitive damages recovery.

## J. PRE-JUDGMENT INTEREST

There are two statutes that govern the awarding of interest. NMSA 1978, § 56-8-3 provides that, in the absence of a written contract fixing a different rate, the rate of interest "shall be not more than" 15% per annum on money due by contract or money received to the use of another and retained without the owner's consent. Although it does not specifically reference pre-judgment interest, this statute is applied in New Mexico to set the pre-judgment interest rate where the recovery is based on contract or money retained without the owner's consent. *See, Economy Rentals, Inc. v. Garcia,* 112 N.M. 748, 762, 819 P.2d 1306, 1320 (1991). The other statute governing interest is NMSA 1978, § 56-8-4, which provides that a court "in its discretion" may allow interest of up to 10% from the date the complaint is served after considering whether the plaintiff was the cause of

unreasonable delay in the lawsuit and whether the defendant had previously made a reasonable and timely offer of settlement to the plaintiff. This provision of pre-judgment interest is considered discretionary and not a matter of right. *Trujillo v. Beaty Electric Co.,* 91 N.M. 533, 577 P.2d 431 (Ct. App. 1978). The awarding of pre-judgment interest is within the discretion of the trial court, except that it should be awarded as a matter of right in those cases where the amount due under a contract can be ascertained with reasonable certainty by a mathematical standard fixed in the contract or by established market prices. *Haaland v. Baltzley,* 110 N.M. 585, 589, 798 P.2d 186, 190 (1990).

In the event that Simmons proves entitlement to recovery of actual damages in any amount, the question is whether the amount due can properly be shown by Simmons with reasonable certainty. If not, then the discretionary 10% interest that does not begin accruing until the date the complaint is served under § 56-8-4 should apply. Otherwise, § 56-8-3 would apply. As set forth in that statute, 15% is the *maximum* – by its terms it does not preclude the court's award of a lower rate of interest. There is no interest rate set forth in the subject contracts setting a different interest rate. Defendants submit that an 8.75% interest rate for the pre-judgment interest rate would be appropriate under such circumstances, as it is the rate that would be applied on a New Mexico judgment under § 56-8-4(A), and the federal post-judgment interest rate, which is tied to Treasury bill rates, provides for an equivalent or lower rate. This would better reflect the time value of money, and would better serve the purpose of awarding pre-judgment interest.

## K. ATTORNEYS' FEES

New Mexico follows the American Rule, which provides that parties to litigation are ordinarily responsible for their own attorneys' fees. *Montoya v. Villa Linda Mall, Ltd.*, 110 N.M. 128, 129, 793 P.2d 258, 259 (1990). New Mexico courts award attorneys' fees *only* in those instances where a statute, contract or court rule so provides. *New Mexico Right To Choose/NARAL*

*v. Johnson*, 1999-NMSC-028, 127 N.M. 654, 657; *New Mexico State Highway and Transportation Department v. Baca,* 120 N.M. 1, 6, 896 P.2d 1148, 1153 (1995). Accordingly, where a plaintiff in a breach of contract action may recover attorneys' fees if the contract so provides, *Fortier v. Dona Ana Plaza Partners,* 747 F.2d 1324, 1337 (10th Cir. 1984), for non-contract claims, each party must bear its own attorneys' fees. *Id.* at 1338. The Gas Contracts do not contain any provision allowing for the prevailing party to recover attorneys' fees. Simmons is not suing under any statute which provides for the recovery of attorneys' fees. Simmons cannot recover attorneys' fees in this action.

Respectfully submitted,

STRATTON & CAVIN, P.A.

By: 
Sealy H. Cavin, Jr.
Stephen D. Ingram
40 First Plaza, Suite 610
Albuquerque, New Mexico 87102
(505) 243-5400
(505) 243-1700 (Facsimile)

Sean P. Downes
SHOOK & DOWNES, P.L.L.C.
2727 E. 21st E. Street, Suite 310
Tulsa, Oklahoma 74114
(918) 744-0833
(918) 744-5643 (Facsimile)

ATTORNEYS FOR DEFENDANTS

I hereby certify that a true and correct copy of
the foregoing document was mailed via first class
mail to the following counsel at the address shown below
on the 3rd day of May, 2002.

F. Franklin Honea
WINSTEAD, SECHREST & MINICK, P.C.
5400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270-2199

Richard L. Gerding
GERDING & O'LOUGHLIN
P.O. Box 1020
Farmington, New Mexico 87499-1020

STRATTON & CAVIN, P.A.

By: _____
    Stephen D. Ingram