IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW MEXICO

DJ SIMMONS, INC.,               )
                                )
            Plaintiff,          )        CIV. 99-1105 JP/LFG
                                )
      v.                        )
                                )
B/R ENERGY PARTNERS, INC.,      )        MEMORANDUM OPINION
and F. BRIAN BROADDUS, et al.,  )
                                )
            Defendants.         )
_____)

        This matter came on for trial before the Court
commencing May 13, 2002.  Evidence was adduced by both plaintiff
and defendants, and the trial was completed on May 21, 2002, with
the presentation of closing arguments.  The Court has reviewed
the evidence, the arguments of counsel, the briefs and proposed
findings of fact and conclusions of law and now makes the
following findings of fact and conclusions of law pursuant to
Fed. R. Civ. P. 52(a).

### CLAIMS OF THE PARTIES

        This action arises from a dispute between Simmons and
B/R Energy regarding the proper accounting and payment due
Simmons for natural gas liquids processed at plants within San
Juan County, New Mexico.

        Simmons claims damages resulting from breach of
contract, breach of the duty of good faith and fair dealing, and
breach of fiduciary duty arising therefrom; Simmons also asserts
claims based on fraud, mistake and conversion.  In addition,
Simmons seeks to impose personal liability on F. Brian Broaddus



and Phoenix for B/R Energy's obligations based on claims of alter
ego, fraud, denuding assets of B/R Energy and fraudulent
transfers to Simmons.

The defendants generally denied these claims and
further claimed that no fiduciary relationship existed between
the parties, that the fraud claim fails as it is not pled with
sufficient particularity, that the claims are barred by the
statute of limitations and are further barred by the affirmative
defenses of estoppel, laches and waiver.

Certain claims of Simmons were resolved during trial.
On May 16, 2002 (Tr. at p. 810), the parties entered into the
following stipulation:

> F. Brian Broaddus and the Phoenix
> Energy Consulting Services, Inc.,
> Defendants in this action, hereby
> stipulate and confess judgment as
> follows: that each is jointly and
> severally liable with B/R Energy
> Partners, Inc., for any and all
> damages of any kind, interest and
> cost, if any, which this Court may
> enter against B/R Energy Partners,
> Inc., in the final judgment in this
> action, and hereby expressly waive
> all rights to appeal said final
> judgment on any grounds.
>
> DJ Simmons, Inc., Plaintiff in this
> action, hereby stipulates not to
> introduce, from this point forward
> in the trial of this action through
> examination of witnesses,
> documents, or by argument, any
> facts directly relevant to its
> alter ego, denuding the assets of a
> corporation, fraudulent transfers
> and successor corporation liability
> claims, including events relating
> to Broaddus' individual
> transactions with B/R Energy, Inc.,

-2-

transactions of B/R Energy
Partners, Inc., after its
dissolution, transaction of Phoenix
Energy Consulting Services, Inc.
and transactions of F. Brian
Broaddus subsequent to the
dissolution of B/R Energy Partners,
Inc., and request that the Court
disregard and strike from the
record any comments in opening
statements or evidence thus far
concerning such matters.

Further, it is requested that any
of such matters be stricken from or
be disregarded and stricken from
the proposed findings, arguments,
and conclusions of law and trial
briefs submitted by the parties,
and additionally the pretrial
order, the joint pretrial order,
with respect to those claims.

All parties hereby announce that
this stipulation is voluntarily
entered into by each party with the
advice and consultation of their
respective counsel.

To memorialize this stipulation,
each party will now, on the record
in open court, state that -- state
that he or it moves that the Court
accept the entire stipulation as it
has been stated without reservation
or modification.

All parties then agreed with the foregoing stipulation
and the Court accepted the stipulation and now finds that the
defendants Broaddus and Phoenix are jointly and severally liable
with B/R Energy Partners, Inc., for any and all damages of any
kind, together with interest and costs, if any, for which the
Court finds the defendant B/R Energy liable to Simmons arising
from this action.

At the close of plaintiff's case, defendants moved for directed verdict on Simmons' claims of conversion and breach of fiduciary duty.  This motion was denied as to Simmons' claim of breach of fiduciary duty but was granted as to Simmons' claim for conversion.  The evidence was undisputed that pursuant to the gas marketing agreements between Simmons and B/R Energy, title to the gas sold by Simmons to defendant B/R Energy was conveyed at the well head.  The conversion claim is based on Simmons' claim that B/R Energy failed to account for one hundred per cent (100%) of the liquid credit produced as the result of the gas being processed by the El Paso Chalco and/or Conoco/Amoco/Blanco plants located in the San Juan Basin.  Simmons claims that this failure to account constituted a conversion.  However, at the tailgate of the plant processing the gas, Simmons had no title to the gas or the liquids but simply was entitled to receive payment for the liquid credits in accordance with the gas marketing agreement.

In order to recover under a theory of conversion, a plaintiff must have an ownership interest or a right to immediate possession of the property allegedly converted.  *See Broadcort Capital Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1192 (10th Cir. 1992)(quoting *Aragon v. General Elec. Credit Corp.*, 557 P.2d 572 (N.M. Ct. App. 1976); *Stephen v. Philips*, 689 P.2d 939 (N.M. Ct. App. 1984).  In New Mexico conversion has been defined as the "unlawful exercise of dominion and control over property belonging to another in defiance of owner's rights, or acts constituting an unauthorized and injurious use of another's

-4-

property, or a wrongful detention after demand has been made."
*Security Pacific Fin. Serv. v. Signfilled Corp.*, 956 P.2d 837,
842 (N.M. Ct. App. 1998).  Because title passed to B/R Energy at
the wellhead pursuant to the Wellhead Gas Purchase and Sales
Agreements, this claim must fail.  Simmons had no title to the
gas thereafter, and the agreements provide no right to immediate
possession of the gas.  *See Rahanian v. Ahbout*, 694 N.Y.S.2d 44
(N.Y. App. Div. 1999); *Farmers Ins. Exch. v. Zerin*, 61 Cal. Rptr.
2d 707 (Cal. Ct. App. 1997); *Desbien v. Penokee Farmers Union
Coop. Ass'n*, 552 P.2d 917 (Kan. 1976).

      For these reasons the Court granted the defendants'
motion and dismissed Simmons' claim for conversion.  The claims
that remain for decision are Simmons' claims for breach of
contract, breach of the duty of good faith and fair dealing, and
breach of fiduciary duty arising therefrom, fraud and mistake.

### JURISDICTION AND VENUE

      Simmons is a corporation incorporated in the State of
Delaware with its principal place of business in Farmington, New
Mexico.  B/R Energy was a corporation incorporated in Texas with
its principal place of business in the State of Texas.   The
defendant F. Brian Broaddus is a resident of and citizen of
Oklahoma who was at all relevant times the president, sole
director and shareholder of B/R Energy.  The defendant Phoenix
Energy Consulting Services is a corporation incorporated and
doing business in the State of Oklahoma.  Accordingly, this Court
has removal jurisdiction over this action pursuant to 28 U.S.C. §

1441 and 28 U.S.C. § 1332 as Simmons and the defendants are
citizens of different states and the amount in controversy
exceeds $75,000, exclusive of interest and costs.

Venue is also proper under 28 U.S.C. § 1391(a)(2) in
that a substantial part of the events or omissions giving rise to
the claims of plaintiff occurred in the District of New Mexico,
and the property involved is situated in the District of New
Mexico.

**BACKGROUND**

Since sometime prior to 1952, D.J. Simmons Company,
operating as a proprietorship, was located in Fort Worth, Texas.
At some subsequent time, it became a limited partnership until
its incorporation in 1994 under the laws of Delaware with its
principal place of business in Farmington, New Mexico.  A.B.
Geren, a nephew of D.J. Simmons, had been associated with the
Company since 1952, serving generally as its manager and later
its president.

The business of D.J. Simmons either as a
proprietorship, a limited partnership, or as a corporation has
been the production of natural gas.  Prior to the early 1990's,
Simmons sold its gas directly to El Paso pursuant to two twenty-
year contracts.  In approximately 1990 or 1991, Mr. Bill
Manchester was hired primarily to handle the move of the
administrative offices of plaintiff from Fort Worth, Texas, to
Farmington, New Mexico, the site of the San Juan Basin.  Prior to
the 1990's, neither Mr. Manchester or Mr. Geren had ever been

-6-

involved in negotiating any gas marketing contracts.   In 1994, Mr. John Byrum was hired by Simmons to subsequently succeed Mr. Manchester.

In the early 1990's, Simmons either owned or operated approximately three hundred (300) wells in the San Juan Basin and in 1991, it began selling its gas to Windward Energies, an Oklahoma company.  At that time, Brian Broaddus was an employee of Windward.  He had been in the gas marketing business since about 1979 or 1980.  Nine or ten years with El Paso Gas and then in 1989, he was hired by Windward Energy.

Having learned that Windward was in some difficulty, Broaddus advised Simmons that it should look for another gas marketer, and he assisted in introducing Simmons to Schneider Gas Marketing, Inc.  The record (Exhibit D-Z) reflects that there were three contracts entered into between Simmons and Schneider Gas Marketing, Inc.  The first of these is dated June 24, 1992. There are no specific references in that contract with respect to the manner in which liquid credits would be handled.  The contract was renewed by a subsequent contract dated June 24, 1993, which contains an Article IV, ¶ B, which is identical to that paragraph as it appears in Exhibit P-1.  Effective February 1, 1994, a new gas purchase and sales agreement was entered into between Simmons and Schneider Marketing, Inc., which again makes no reference to the handling of liquid credits.  (Each of these agreements appear in Exhibit D-Z.)

-7-

Schneider cancelled its contract with Simmons early in 1995 on two weeks notice, and Simmons again used Mr. Broaddus to help it find another gas marketer.  He introduced them to Cook Inlet and Simmons and Cook entered into a marketing agreement effective March 1, 1995 (Exhibit D-G).  This contract contained a pricing provision identical to the second Schneider contract. Manchester testified that Simmons relied on Brian Broaddus to secure and maintain gas marketing contracts.  Shortly thereafter, Cook Inlet advised Manchester that they were no longer dealing with Brian Broaddus, that he was no longer going to be acting as their agent or intermediary, which resulted in the early termination of the Cook contact.

At this time, Simmons began dealing directly with B/R Energy to serve as its gas marketer.  The first contract presented to and approved by Simmons was the December, 1995, contract which covered 1996, and the language in that contract with respect to liquid credits is identical to the Cook contract and to the second of the three Schneider contracts.

All the gas sold by Simmons pursuant to the Schneider, Cook and B/R Energy gas marketing agreements was actually processed through the El Paso Chalco plant.  However, pursuant to a straddle agreement entered into in the latter part of the 1980's between El Paso and Conoco/Amoco, who owned the Blanco plant, a certain percentage of the gas gathered by El Paso would be deemed to have been processed through the Blanco plant.  Gas processed through the Chalco plant was charged $.1502 per MMBTU

-8-

while the gas processed through the Blanco plant was not charged a processing fee as such, but the plant retained thirty-nine per cent of the liquids in lieu of a processing fee.  In late 1996, it became apparent that El Paso was going to convert the Chalco plant to a cryogenic plant which would use the same process as the Blanco plant.  Prior to the change over, the Chalco plant was referred to as a non-cryogenic plant, and the Blanco plant was referred to as a cryogenic plant.  The cryogenic method is more efficient and produces more liquids from the gas being processed through the system.  Generally the prices for the liquids are better than the price for the natural gas or methane which is the residue gas.[1]

B/R Energy typically sent Simmons monthly reports that set forth the amounts being received for the residue gas and for the liquids.  These reports were similar to the reports Simmons received from prior marketers of its gas.  No one at Simmons paid much attention to the reports until the middle part of 1998, when John Byrum discovered that the report he was reviewing did not agree with reports he received from El Paso Field Services with respect to the gas that was being processed through the Chalco and Blanco plants.  Bryum then began to investigate other reports.  Simmons claims this investigation led to the discovery that a thirty-nine per cent retention was taken by the Blanco

---

[1] The residue gas and the price paid for the residue gas is not at issue in this case.  The only issue is whether or not B/R Energy properly calculated the amount of credit which the plaintiff should receive for the liquids which were separated from the gas as it went through the processing plants.

plant.  In 1998, a similar retention was being taken by the Chalco plant in addition to $.20 per MMBTU provided for in that contract (Exhibit P-5).

## DISCUSSION

A) Breach of Contract

At issue in this case are those provisions of the three gas marketing agreements between Simmons and B/R Energy which relate to the payment for the natural gas liquids extracted from the gas sold by Simmons to B/R Energy.

The applicable provisions of the three contracts are as follows:

1) The 1995 contract (Exhibit P-1 - Article IV, ¶ B):

> Buyer shall pay Seller the Price posted as the El Paso Natural Gas Company spot market index, for San Juan Basin-New Mexico as published in the first of each contract month issue of <u>Inside F.E.R.C.'s Gas Market Report</u>, plus $.01 per MMBTU on a dry basis.  Seller will be charged the actual gathering and transportation fees and fuel shrinkage assessed by El Paso Natural Gas Company.  Seller will receive liquid credits.

2) The 1996 contract (Exhibit P-3 - Article IV, ¶ B):

> Buyer shall pay Seller a price of $1.72 per MMBTU for the first 1,000 MMBTU of residue gas delivered to the El Paso mainline.  For the balance of the gas produced, Buyer shall pay Seller the price posted as the El Paso Natural Gas Company spot market index, for San Juan Basin-New Mexico as published in the first of each contract month issue of <u>Inside F.E.R.C.'s Gas Market Report</u>, plus $.01 per MMBTU (dry basis), on residue gas.  Buyer shall deduct the gathering,

processing, and dehydration fees
from Seller's proceeds as posted in
El Paso Field Services.   In
addition, Buyer shall pay Seller
liquids credits attributable to
100% of such production.

3) The 1998 contract (Exhibit P-5 - Article IV, ¶ B):

The price posted as the EPNG spot
market index, for San Juan Basin-
New Mexico as published in the
first of each contract month issue
of <u>Inside F.E.R.C.'s Gas Market
Report</u> "IFGMR."  Seller will be
charged a gathering fee (10% of
IFGMR index), $.2000 per MMBTU
processing fee and a $.025 per
MMBTU dehydration fee,* plus fuel
shrinkage on EPFS gathered volumes.
Such rates are subject to change.
Seller, at it's option, may sell a
portion of the produced volume on a
firm basis under a fixed price and
term, which will be determined by
mutual agreement at the time Seller
exercises it's option.

* (Dehydration fee may be changed
to $.005 per MMBTU pending physical
testing.)

Buyer shall pay Seller liquid
credits for NGL gallons attributed
to Buyer's GPAS agreement based on
OPIS Mt. Belvieu averages, less any
processing, transportation,
fractionation, and marketing fees
assessed.  Buyer will deduct and
pay applicable State of New Mexico
natural gas processor's tax on
Seller's behalf.

These three contracts extend over a period of thirty-

seven (37) months.

Simmons contends that the language in the 1995 contract

"seller will receive liquid credits" are in effect terms of art

used in the gas marketing industry and mean that the seller will

-11-

receive 100 per cent of the liquid credit.  However, the evidence
does not support a finding that there is such a standard meaning
in the industry.  From the testimony, the Court finds that the
term "liquid credits" has reference to the value of the liquid --
either market value or value as determined by contract, less
deductions for processing, transportation and fractionation.
While Simmons may not be a sophisticated seller of natural gas,
it understood that a processing fee would be charged by the
processor for the separation of the liquids from the natural gas.
Thus, while the 1995 contract makes no reference to a deduction
for processing, Simmons admits that it expected to be charged a
processing fee.  This processing fee was in the form of so many
cents per MMBTU.  Under the 1995 contract, this price was $.1502
per MMBTU (Exhibit P-56-60) and in the 1998 contract (Exhibit P-
5), the price was twenty cents per MMBTU.

        The issues are:  (1) whether the seller was entitled to
receive payment for 100 per cent of the liquids produced as the
result of the processing through the Chalco and Blanco plants;
and (2) whether a proper price was paid for those liquids by B/R
Energy pursuant to the contract terms.

        The straddle agreement and the practice of liquid
retention by the Blanco plant were in effect before the contracts
at issue were entered into.  It is clear that Simmons under both
the Schneider and the Cook Inlet contracts was being charged a
liquid retention processing fee for that portion of the gas
deemed to have been processed through the Blanco plant.  Simmons

-12-

contends that the contracts between it and Schneider and Cook are
not relevant because this is not prior dealing between the same
parties so as to establish a course of dealing which would be
binding on it.  The defendants did not offer those contracts for
that purpose but offered them in support of their contention that
Simmons either knew or should have known that the gas deemed
processed through the Blanco plant would carry a thirty-nine per
cent liquid retention charge in lieu of a processing fee.  By
September of 1995, Simmons had in its file Exhibit D-Q, a letter
dated September 28, 1995, from El Paso Field Services, which
contained two attachments, both of which make it clear that the
product extraction service at the new Blanco plant would be paid
by a thirty-nine per cent liquid retention while the product
extraction service at the El Paso Field Services Chalco plant
could be paid by either a processing fee or a liquid retention.
(See also Exhibits P-56-60).

        The resolution of the first of the above two issues
presented above depends in part on whether Simmons can plead
ignorance of the practices of the industry or trade of which it
is a part, and if it cannot, then does the law permit the Court
to consider these practices in interpreting the contracts at
issue in this case.  The Court finds Simmons is chargeable with
knowledge of the trade in which it does business.  When a
business enters into a contract in the ordinary course of such
business, the law presumes that any applicable general trade
usage relating to that business is incorporated into the

-13-

contract.   This conclusion is dictated by New Mexico's Uniform

Commercial Code, case law examining the Uniform Commercial Code,

and various scholarly writings on the subject.

N.M. Stat. Ann. § 55-2-202 provides that terms in a

contract may be "explained or supplemented" by evidence of course

of dealing, usage of trade, or course of performance.   Official

Comment 2 to § 55-2-202 states that the section

> makes admissible evidence of course
> of dealing, usage of trade and
> course of performance to explain or
> supplement the terms of any writing
> stating the agreement of the
> parties in order that the true
> understanding of the parties as to
> the agreement may be reached.   Such
> writings are to be read on the
> assumption that the course of prior
> dealings between the parties and
> the usages of trade were taken for
> granted when the document was
> phrased.   Unless carefully negated
> they have become an element of the
> meaning of the words used.

N.M. Stat. Ann. § 55-1-205 provides the general

definition of "usage of trade" as follows:

> A usage of trade is any practice or
> method of dealing having such
> regularity of observance in a
> place, vocation or trade as to
> justify the expectation that it
> will be observed with respect to
> the transaction in question.   The
> existence and scope of such a usage
> are to be proved as facts.

§ 55-1-205(2).   This section "does not require that the usage be

certain and precise; it merely requires that the usage be 'any

practice or method of dealing.'"   White & Summers, *Uniform*

*Commercial Code* § 3-3.

-14-

N.M. Stat. Ann. § 55-1-205(5) provides that "[a]n applicable usage of trade in the place where any part of performance is to occur shall be used in interpreting the agreement as to that part of the performance." Official Comment 1 to the section explains that

> the meaning of the agreement of the parties is to be determined by the language used by them and by their action, read and interpreted in the light of commercial practices and other surrounding circumstances.

Official Comment 4 states that "[t]he language used is to be interpreted as meaning what it may fairly be expected to mean to parties involved in the particular commercial transaction in a given locality or in a given vocation or trade." N.M. Stat. Ann. § 55-1-205, *cmt. 4; see Restatement (Second) of the Law of Contracts* § 222, *cmt. c.*

These code sections establish several important points. First, the question of the existence of a trade usage is one of fact, not law. Second, the usage of trade need not be industry wide but can be local, thus it can be those practices that are observed in the San Juan Basin in New Mexico. Third, the Official Comments direct us to read the contracts in light of the commercial practices as well as any other circumstances that surround the agreements.[2]

---

[2] New Mexico case law is consistent with this directive. *See Memorial Med. Ctr. v. Tatsch Constr. Inc.,* 12 P3d 431 (N.M. 2000)(noting that in interpreting a contract, a trial court can properly consider circumstances surrounding an agreement as well as any relevant usage of trade); *Creson v. Amoco Prod. Co.,* 10 P.3d 853 (N.M. Ct. App. 2000)(Same); see also 5 Corbin on

The statutory language provides support for the proposition that Simmons is chargeable with knowledge of the industry or trade in which it engages, and more specifically, it is presumed to know the commercial practices that occur in the San Juan Basin. *See Wolfe v. Texas Co.*, 83 F.2d 425 (10th Cir. 1936). The Tenth Circuit also has stated that "[p]arties to a contract are presumed to know a well-defined trade usage generally adopted by those engaged in the business to which the contract relates." United *States v. Stanolind Crude Oil Purchasing Co.*, 113 F.3d 194, 200 (10th Cir. 1940); *accord, Wolfe, supra.*

The question remains as to whether the Court can consider the contracts that Simmons entered into before its contracts with B/R Energy as evidence of trade usage or for some other legitimate reason. The Court believes it can consider these contracts in interpreting the 1995, 1996 and 1998 gas marketing contracts at issue in this case for several reasons. First, regardless of the presumption of knowledge of trade usage

---

Contracts § 24.13 (stating that "[t]he final interpretation of a word or phrase should not be adjudged without giving consideration to all relevant word usages, to the entire context of the whole contract, and to all relevant surrounding circumstances."). Evidence of commercial practices provide a court with some context with which to judge whether the interpretation of a contract urged by one party or the other is one that a reasonable person would enter into. *See Smith v. Tinley*, 674 P.2d 1123 (N.M. 1984)(stating that "an interpretation rendering a contract such that reasonable men would not enter into it is disfavored"). The Uniform Commercial Code calls for interpreting an agreement according to its actual commercial setting. *See* 12 *Williston on Contracts* § 34:5 (noting that "the measure and background for interpretation of a particular term are set by the commercial context in which it is used.").

discussed above, the prior contracts show that Simmons knew or at least should have known about the Blanco liquid retention practice.   Second, the other contracts provide a useful insight into what the terms of the three contracts at issue in this case mean - particularly if they were worded and administered in the same fashion.   *See 1 McCormick on Evidence,* § 198 (5th Ed. 1999). For these reasons, the Court will look to the prior contracts with other parties to help interpret the meaning of the 1995, 1996, and 1998 contracts.

**The 1995 Contract**

The language at issue in this contract (Exhibit 1) is found in Article IV ¶ B, and reads:  "Seller will be charged the actual gathering and transportation fees and fuel shrinkage assessed by El Paso Natural Gas Company.  Seller will receive liquid credits."

As previously noted, there is no reference in this contract to processing fees.  However, processing fees were charged for all of the gas that was processed through both the Chalco and the Blanco plant.  The gas deemed processed through the Blanco plant was assessed a thirty-nine per cent liquid retention fee and the gas that was processed through the Chalco plant a processing fee of $.1502 per MMBTU.

Simmons does not contend that a processing fee should not be paid, even though the contract failed to include a provision to that effect.  However, Simmons contends that the processing fee for all of the gas should have been at the rate of

-17-

$.1502 per MMBTU, that no liquid retention should have been taken for the gas processed through the Blanco plant and that it should receive credit from the defendants for the gross gallons of liquids produced by the two plants.  As to the 1995 contract, this issue of gross gallons is only applicable as it relates to the gas deemed processed through the Blanco plant.

Whether or not Simmons was in fact aware of the liquid retention processing fee charged by the Blanco plant is not dispositive of this issue.  The Court is satisfied that Simmons knew or should have known from its prior dealings with the marketing of gas in the San Juan Basin through the El Paso gathering system that such a processing fee was being charged. Indeed, the evidence is undisputed that these fees were charged during both the course of the Schneider and the Cook contracts. While that does not constitute a course of dealing, it does reflect what Simmons had been accepting as performance of contracts bearing language identical to the language in Exhibit P-1, Article IV, ¶ B.  Also significant is a letter which Simmons received from El Paso Field Services under date of September 28, 1995 (Exhibit D-Q), and in particular, paragraphs 3.0 and 4.0 of the Exhibit D's attached to that letter.  Considering this evidence, the Court finds Simmons must be charged with knowledge that some of the gas it sold B/R Energy would be deemed processed through the Blanco plant and that a processing fee in the form of a liquid retention would be taken by that processor.

-18-

Some reference has been made to the term "fuel shrinkage" in the second to last sentence of Paragraph B. However, the liquid retention is not a "fuel shrinkage" issue. That term refers to the shrinkage of the gas gathered at the well head as a result of the processing of that gas and separating out the liquids.  This is a different issue from the issue of whether Simmons should have expected to receive credit for 100 per cent of the liquids extracted from the gas which is delivered at the well heads.

This, however, does not resolve the issue of whether Simmons is entitled to any recovery on its claim that the defendants breached this contract.  The evidence establishes that Simmons was underpaid for the liquids in the amount of $136,495, less separate payments made in March, 1996, in the amount of $5,988.  This constitutes a breach of the gas marketing agreement by B/R Energy.  Therefore, judgment will be entered for Simmons in the amount of $130,507 on this contract.

**The 1996 Contract**

In negotiating the 1996 contract, the language relating to payment to plaintiff for liquids was modified at Simmons' request to provide:  "In addition, Buyer shall pay Seller liquid credits attributable to 100% of such production."  The contract further provided that B/R Energy would deduct processing fees from seller's proceeds as posted in El Paso Field Services.  This processing fee amounts to $.1502 per MMBTU (Exhibit 57).  The contract, as modified, signaled Simmons' intent to be paid based

-19-

on all the NGL processed from its gas -- in other words, it wanted to pay only a processing fee per MMBTU, with no liquid retention.  The parties agreed to this when they signed this marketing agreement.  According to the evidence, Simmons is entitled to recover for the breach of this agreement the sum of $716,806.  (See also Exhibit 46).

**The 1998 Contract**

Once again the language was changed.  According to this contract, the processing fee was raised to $.20 per MMBTU.  This contract provided: "Buyer shall pay Seller liquid credits attributed to Buyer's GPAS agreement based on OPIS Mt. Belvieu averages, less any processing, transportation, fractionation, and marketing fees assessed.  Buyer will deduct and pay applicable State of New Mexico natural gas processor's tax on Seller's behalf."

However, B/R Energy did not have a GPAS agreement with El Paso in 1998.  Both parties were knowledgeable that both the Chalco and Blanco plants were now cryogenic -- that Blanco charges a 39% liquid retention in lieu of a processing fee per MMBTU and that Chalco offers an option of liquid retention or 20 cents per MMBTU.  With this knowledge, the parties contracted for a $.20 per MMBTU processing charge with no reference to a liquid retention being assessed in lieu of the processing fee.  The Court finds that plaintiff is entitled to recover 100% of the liquid credits, subject to a processing fee of only $.20 per MMBTU and no liquid retention.  According to the testimony of

-20-

Kyle Pearson and Exhibit 46, plaintiff is entitled to recover
$489,029 for B/R Energy's breach of this contract.

**Marketing Fees**

Defendant claims it is entitled to recover marketing
fees on all three contracts.  Neither the 1995 or the 1996
contract make any reference to such fees, and the testimony
satisfies the Court that such fees must be agreed to in the
contract.  (Tr. 119-120).  Thus, no such fees may be charged as
to the liquids sold under those contracts.

The 1998 contract specifically provides" "Buyer shall
pay Seller liquid credits for NGL gallons attributed to Buyer's
GPAS agreement based on OPIS Mt. Belvieu averages, less any
processing, transportation, fractionations, and marketing fees
assessed."  However, the buyer, B/R Energy did not have a GPAS
agreement during the term of the 1998 contract and no marketing
fees were assessed to buyer for the sale of the liquids.  Buyer
agreed to buy all of plaintiff's liquids and pay for them
pursuant to OPIS Mt. Belvieu averages.  The Court finds defendant
was not assessed any marketing fee and therefore is not entitled
to charge plaintiff such a fee.  Defendant's claim for marketing
fees will be denied.

B.   **Duty of Good Faith and Fair Dealing and Breach of
     Fiduciary Duty Arising Therefrom**

Simmons alleges that the defendants breached their duty
of good faith and fair dealing and a fiduciary duty arising
therefrom.  Essentially Simmons is claiming that the defendants

dealt in bad faith in not fairly reporting the proper costs of
processing and the actual gallons of liquids processed from the
gas it sold to defendants.  As the Court has concluded that
defendants breached the three marketing agreements, this claim
becomes moot, although the Court will separately address the
claim that defendant breached a fiduciary duty owed by defendant
to plaintiff, as this would affect plaintiff's claim for
attorney's fees.

        Simmons argues that B/R Energy acted as a fiduciary to
Simmons under the 1995, 1996, and 1998 agreements.  In acting as
a fiduciary, Simmons maintains that B/R Energy breached its
obligation to properly account for the liquid credits that were
to be paid to Simmons pursuant to each contract.  In asserting
this argument, Simmons cites to various cases to support the
proposition that New Mexico law recognizes that a fiduciary or
confidential relationship can arise in a variety of contexts,
many of which need not be formal.  For example, the Court of
Appeals of New Mexico has explained that

> [w]hile this Court and the Supreme
> Court have used different
> definitions for recognizing a
> fiduciary or confidential
> relationship, each definition
> conveys essentially the same
> meaning.  The most recently
> restated definition is "[a]
> fiduciary relationship exists in
> all cases where there has been a
> special confidence reposed in one
> who in equity and good conscience
> is bound to act in good faith and
> with due regard to the interests of
> one reposing the confidence."

-22-

*Moody v. Stribling*, 985 P.2d 1210, 1216 (N.M. Ct. App.
1999)(quoting *Allsup's Convenience Stores, Inc. v. North River
Ins. Co.*, 976 P.2d 1 (N.M. 1998)).  New Mexico case law has not
explicated in great detail how a confidential or fiduciary
relationship can arise, but has only noted that such a
relationship can arise in almost any context.  *See id.*   In
recognizing the deficiencies of New Mexico courts jurisprudence
in this area, Simmons argues that those courts would follow the
path that other states have blazed in fiduciary law.   In
particular, Simmons cites this Court to the law of the State of
Texas.

        The Court first notes that two principles reoccur
throughout this area of the law.  First, courts do not create
fiduciary duties lightly, because the obligations imposed on a
fiduciary are extraordinary, requiring, if need be, the fiduciary
to put the interests of its beneficiary ahead of its own.  *See
SEC v. Cochran*, 214 F.3d 1261 (10th Cir. 2000); *ARA Automotive
Group v. Central Garage, Inc.*, 124 F.3d 720 (5th Cir. 1997);  *Lee
v. Walmart Stores, Inc.*, 943 F.2d 554 (5th Cir. 1991);
*Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171 (Tx. 1997);
*Kline v. O'Quinn*, 874 S.W.2d 776 (Tx. Ct. App. 1994); *see also
Munn v. Thornton*, 956 P.2d 1213, 1220 (Alaska 1998)(noting that
"fiduciary duties are reserved for relationships involving
heightened levels of trust").  Second, a fiduciary relationship
is a "two-way street".  *See Anchor v. O'Toole*, 94 F.3d 1014 (6th
Cir. 1996); *Quinlan v. Koch Oil Co.*, 25 F.3d 936 (10th Cir.

1994); *Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder,
Inc.*, 48 S.W.3d 865 (Tx. Ct. App. 2001); *see also Steinbrugge v.
Haddock*, 281 F.2d 871 (10th Cir. 1960)(noting that courts have
never "gone so far as to allow one person to rely with impunity
upon the superior business judgment of another, merely because he
so chooses, and thus raise an enforceable fiduciary relationship.
He cannot blindly follow the counsel of the other party simply
because it is superior. He owes himself the duty to exercise his
own faculties, knowledge, and experience in related business
affairs"). That is, the relationship must be understood by both
parties to be one where special trust and confidence has been
reposed. Given the context in which the purported fiduciary
relationship arose in this case, these two principles are of
particular import to the Court's resolution of this issue.

From a review of the evidence, the Court finds that the
relationship between Broaddus and Simmons was not one in which a
court should impose upon Broaddus the extraordinary obligations
of a fiduciary. For such a relationship to arise, there must be
a mutual understanding. The evidence does not support a finding
that Broaddus understood that he and Simmons were in such a
relationship.

Furthermore, this dispute arose out of a business
relationship. Perhaps the best statement regarding business
relationships and whether they can give rise to a fiduciary duty
comes from a commentator:

> Like a wolf at the campfire,
> confidential relationship has no

> rightful place within the business
> setting.  The prevailing general
> rule, stated in innumerable cases,
> is that a confidential relationship
> cannot arise from purely business
> interaction regardless of its
> constancy and duration.

Roy Ryden Anderson, *The Wolf at the Campfire: Understanding
Confidential Relationships*, 33 SMU L. Rev. 315, 366 (2000).  This
rather accurate statement is validated by decisions of the Texas
courts.

    Texas courts clearly demarcate business relationships
from other traditional types of relationships that formally give
rise to fiduciary duties.  For instance, one Texas court stated
that "not all business relationships give rise to a fiduciary
duty."  *Kline v. O'Quinn*, 874 S.W.2d at 786.  In addition, the
Texas Supreme Court has explained that

> [t]he fact that one business man
> trusts another, and relies upon his
> promise to perform a contract does
> not rise to a confidential
> relationship.  Every contract
> includes an element of confidence
> and trust that each party will
> faithfully perform his obligation
> under the contract.  Neither is the
> fact that the relationship has been
> a cordial one, of long duration,
> evidence of a confidential
> relationship.

*Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823
S.W.2d 591, 594-95 (Tx. 1992)(citations omitted).   Mere
subjective trust in Broaddus on Simmons' part is not enough to
create a fiduciary relationship. *See Thigpen v. Locke*, 263
S.W.2d 247 (Tx. 1962); *Blue Bell, Inc. v. Peat, Marwick, Mitchell*

-25-

& Co., 715 S.W.2d 408 (Tx. Ct. App. 1986); see also, Kline, 874
S.W.2d at 786 (stating that something apart from the transaction
of the parties is necessary to show a fiduciary relationship).
Texas courts strictly apply this test, "emphasizing the
distinction between factual proof of a confidential relationship
and mere subjective assertions by one party." Consolidated
Bearing and Supply Co., v. First Nat'l Bank at Lubbock, 720
S.W.2d 647 (Tx. Ct. App. 1986). In a similar vein, the Texas
Supreme Court has explained that parties to a transaction cannot
claim ignorance of what they signed – they have an obligation to
read what they sign and unless "there is some basis for finding
fraud, either actual or constructive, they may not excuse
themselves from the consequences of failing to meet that
obligation because they unwisely trusted the other party."
Thigpen, 363 S.W.2d at 253.

        Given this Texas case law, the two principles outlined
above, and the evidence adduced at trial, no fiduciary
relationship existed between either Broaddus or B/R Energy and
Simmons. Thus, Simmons' claim for breach of fiduciary duty will
be denied.

### C.  Attorneys Fees

        Plaintiff also seeks to recover attorney's fees.  One
New Mexico Supreme Court case summarizes the state's rule
regarding attorney's fees. See New Mexico Right to Choose/NARAL
v. Johnson, 986 P.2d 450 (N.M. 1999). In Johnson, the court
stated that New Mexico follows the American Rule regarding

-26-

attorney's fees.  This means that litigants are generally
responsible for their own attorney's fees unless a contract,
statute, or court rule provides otherwise.  The *Johnson* court
noted that it is reluctant "to extend awards of attorney's fees
except in limited circumstances" and went on to explain when
those circumstances arise.  The court noted the following
exceptions to the rule: "(1) exceptions arising from a court's
inherent powers to sanction the bad faith conduct of litigants
and attorneys, (2) exceptions arising from certain exercises of a
court's equitable powers, and (3) exceptions arising
simultaneously from judicial and legislative powers."  *Johnson*,
986 P.2d at 455.  The court reasoned that it could

> trace each of these exceptions to a
> statute or court rule, however,
> they are not contrary to the
> existing American rule, as
> routinely expressed, which only
> bars recovery of reasonable
> attorney fees 'in the absence of an
> authorizing statute or rule of
> court.'  Further, these exceptions
> appear to promote equal access to
> the courts, either for plaintiffs
> whose claims arise from special
> relationships associated with a
> high degree of loyalty, trust,
> confidence, and dependence, or from
> defendants adversely affected by
> unique judicial action.  Finally,
> none of these exceptions appears to
> have burdened judicial resources,
> perhaps because they are narrow in
> scope and perhaps also because
> courts can draw guidance from a
> number of cases that have analyzed
> and applied these exceptions over
> time.

*Id.* (internal citations and emphasis omitted).

-27-

The *Johnson* court also stated that some "exceptions arise simultaneously from the court's equitable powers as well as the Legislature's authority." *Id.* at 457.  One such exception is for breaches of fiduciary duties.  However, the exception was only utilized in cases involving partnerships and estates, where statutes supplied the basis for awarding attorney's fees.  *See id.* (citing *Turpin v. Smedinghoff*, 874 P.2d 1262 (N.M. 1994)(partnership statutes); *Bassett v. Bassett*, 798 P.2d 160 (N.M. 1990)(partnership statutes); *In re Estate of Gardner*, 845 P.2d 1247 (N.M. Ct. App. 1992)(probate code)).  The *Johnson* court specifically cited *Turpin*, which held that the partnership statutes "imply the basis for an award of attorney's fees only when there has been a breach of fiduciary duty as a result of constructive fraud that results in actual harm or when one partner sues in order to maintain the common fund."  *Turpin,* 874 P.2d at 1265.

Here, Simmons requests this Court to award it attorney's fees.  That request appears in the Pretrial Order.  Simmons has done nothing more than request the fees.  It has not argued the basis for such an award.  It has not argued that a statute requires this Court to award it such fees.  Likewise, it has not cited to a contractual provision or a court rule that requires such an award.  Finally, it has not asserted that an exception to the American rule is present in this case that would justify an award of attorney's fees.  Given these failures, the Court has been presented with nothing, other than Simmons'

-28-

unsupported claim for attorney's fees, that could persuade it to award the fees.  Moreover, the Court's investigation into the matter satisfies it that an award of attorney's fees to Simmons in this matter is not warranted and this request will be denied.

### G.  **Fraud and Mistake**

The Court has reviewed the parties' briefs and the evidence and finds no basis for Simmons' claims of fraud or mistake.  The Court's denial of Simmons' claim of breach of fiduciary duty and its claim of breach of duty of good faith and fair dealing adequately disposes of Simmons' fraud claim.

As to Simmons' claim of mistake, the evidence does not support this claim, and it will be denied.

### CONCLUSION

The Court finds that the defendants breached each of the three agreements and Simmons is entitled to damages as follows:

| | | |
|---|---|---|
| 1995 contract | - | $130,507.00 |
| 1996 contract | - | $716,806.00 |
| 1998 contract | - | $489,029.00 |

During trial, Simmons' expert admitted that he had overlooked one item in his audit of the calendar year 1997 (the 1996 contract, P-3) relating to the gathering rate charged, and his damage model is subject to an adjustment credit of $54,749.64, which rounds to $54,750.00. (Tr. 179:1-15).

Accordingly, judgment will be entered for Simmons and against all defendants, jointly and severally, in the amount of $1,281,592.00.  A separate order will be entered in accordance with this memorandum opinion.

DATED this 7Th day of November, 2002.

BY THE COURT:

LYLE E. STROM, Senior Judge
United States District Court

-30-